PARRO, J.
|2In this medical malpractice case, the appellants, Dr. Shawn Humphries and the Louisiana Patient’s Compensation Fund and Louisiana Patient’s Compensation Fund Oversight Board (collectively, the Board), through the defendants, Dr. Hum-phries and Lady of the Sea General Hospital, appeal the trial court’s entry of a judgment notwithstanding the jury’s verdict and its conditional grant of a motion for a new trial in favor of the plaintiffs, Duane and Torrie Wood. For the following reasons, we reverse that judgment and reinstate the jury’s verdict, together with the judgment of April 13, 2011, rendered in accordance with the jury’s verdict.
FACTUAL AND PROCEDURAL BACKGROUND
Duane and Torrie Wood filed a petition against Dr. Shawn Humphries and Lady of the Sea General Hospital (LOSGH), located in Lafourche Parish, alleging that they breached the applicable standard of care in their emergency room treatment of Mr. Wood on March 30, 2005, resulting in serious and permanent damage to him as the result of a major stroke. After extensive discovery, the case was tried to a jury on March 30 and 31, 2011, and April 1, 4, and 5, 2011. The first question on the special jury interrogatories asked whether the jury found, by a preponderance of the evidence, that the plaintiffs had proved the standard of care applicable to Dr. Hum-phries and LOSGH regarding the medical care provided to Mr. Wood. The jury response as to both defendants was “No.” On April 13, 2011, the court signed a judgment in accordance with the jury verdict, dismissing the suit with prejudice.
The plaintiffs filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for a new trial. After a hearing on May 31, 2011, the court granted the motion for JNOV and rendered judgment in favor of Mr. Wood in the amount of $5,580,675 and in favor of Mrs. Wood for $150,000, plus judicial interest on both awards from November 3, 2005, until paid, and all court costs. The judgment also ordered the defendants to pay expert fees in the amount of $12,000. The court allocated 90% fault to Dr. Humphries and 10% fault to LOSGH. To comply with the | ^medical malpractice cap on damages in LSA-R.S. 40:1299.42(B)(1), the total amount of damages awarded was reduced to $500,000, plus legal interest and costs, exclusive of future medical care and related benefits, as provided in LSA-R.S. 40:1299.43. The motion for new trial was also conditionally granted in favor of the plaintiffs, in accordance with LSA-C.C.P. art. 1811(C)(1) and (2), for the same reasons that supported the trial court’s grant of the JNOV. The judgment was signed June 20, 2011.
The Board became involved in the appeal as a matter of law, because the court had granted the JNOV and awarded damages above the statutory cap of $100,000 for qualified health care providers, as provided in LSA-R.S. 40:1299.42(B)(2). The plaintiffs dismissed their claims against LOSGH with full reservation of their claims against the Board.[1] Dr. Humphries and the Board filed suspensive appeals of the judgment.
The Board assigns as error the trial court’s reversal of the jury’s verdict and granting of the JNOV, based on the court’s allegedly faulty interpretation of the Medical Malpractice Act and LSA-C.C.P. art. *1109 1811, and the court’s award of damages. Dr. Humphries assigns as error the trial court’s granting of the JNOV, claiming the evidence introduced by the plaintiffs through their experts regarding the applicable standard of care was contradicted by the defendants’ experts, making the jury’s verdict a reasonable one. She also assigns as error the trial court’s failure to give great deference to the jury’s conclusion and its conditional grant of a new trial.
ANALYSIS
The plaintiffs’ burden in a medical malpractice case against a physician is to prove by a preponderance of the evidence the three elements set forth in LSA-R.S. 9:2794(A), which states, in pertinent part:
A.In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a ^particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
These elements can be summarized in the context of this case as requiring Mr. and Mrs. Wood to prove: (1) the standard of care applicable to Dr. Humphries in her practice as an emergency room physician; (2) Dr. Humphries’ breach of that standard of care; and (3) the causal relationship between that breach and the injuries sustained by Mr. and Mrs. Wood. The jury verdict in this case was that the plaintiffs failed to prove the standard of care applicable to Dr. Humphries. Obviously, if that standard of care is not known, it is impossible to determine whether it was breached. Therefore, the jury’s answer to this question required the court to enter judgment dismissing the plaintiffs’ case.

Judgment Notwithstanding the Verdict

A JNOV is a procedural device authorized by LSA-C.C.P. art. 1811, by which the trial court may modify the jury’s findings to correct an erroneous jury verdict. Article 1811 states, in pertinent part:
A. (1) Not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of judgment under Article 1913, a party may move for a judgment notwithstanding the verdict.
(2) A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.
B. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict.
C. (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed *1110 and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus ^conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.
Article 1811 does not set out the criteria to be used when deciding a motion for JNOV. However, the Louisiana Supreme Court has established the standard to be used in determining whether a JNOV is legally called for, stating:
JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at á contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that “[wjhen there is a jury, the jury is the trier of fact.” (Citations omitted).
Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94, 99.
In a case such as this, the trial court must first determine whether the facts and inferences point so strongly and overwhelmingly in favor of the plaintiffs that reasonable jurors could not arrive at a contrary verdict. Stated simply, if reasonable persons could have arrived at the same verdict, given the evidence presented to the jury, then a JNOV is improper. Cavalier v. State, Dep’t of Transp. & Dev., 08-0561 (La.App. 1st Cir.9/12/08), 994 So.2d 635, 644.
An appellate court reviewing a trial court’s grant of a JNOV employs the same criteria used by the trial court in deciding whether to grant the motion. See Smith v. State, Dep’t of Transp. & Dev., 04-1317 (La.3/11/05), 899 So.2d 516, 525. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. Id. If the answer is in the affirmative, then the appellate court must affirm the grant of the JNOV. Id. However, if the appellate court determines that reasonable minds could differ on that finding, then the trial court erred [fin granting the JNOV, and the jury verdict should be reinstated. Id.
Therefore, our initial inquiry is whether the evidence at trial so overwhelmingly supported the plaintiffs on the standard of care issue that reasonable jurors could not have concluded that the plaintiffs had failed to establish the standard of care applicable to Dr. Humphries’ treatment of Mr. Wood. If so, then the trial court was correct in granting the JNOV. However, if reasonable jurors in the exercise of impartial judgment might conclude from the evidence that the plaintiffs had failed to establish the applicable standard of care, then the trial court erred in granting the motion, and the jury’s verdict should be *1111 reinstated. See Gutierrez v. Louisiana Dep’t of Transp. & Dev., 11-1774 (La.App. 1st Cir.3/23/12), 92 So.3d 380, 386. To make this determination, this court must examine all the trial evidence provided by the medical experts for both parties concerning the applicable standard of care.
Dr. Craig Kennedy, board certified in family practice and emergency medicine, was the first expert witness called by the plaintiffs; he testified as a medical doctor with a specialty in emergency room medicine. He stated that in emergency medicine, the physician must know how to recognize the signs and symptoms of a stroke. He said that if he suspected that a patient might be having a stroke, he had to transfer that patient to a medical center with more technology, more testing capability, and more specialists to determine if there was a stroke or not. Whether working in a small or large facility, the emergency room physician has the same duty to the patient to rule out the most life-threatening thing first and get the patient into the hands where he needs to be. Dr. Kennedy said the standard of care for an emergency room doctor or nurse was no different in Louisiana than it was anywhere else in the country. That standard included the identification of a stroke, diagnosis, and treatment or transfer. Asked specifically about the standard of care for an emergency room physician in the treatment and diagnosis of a patient with a suspected stroke, he said:
Well, the standard of care being that which a reasonable and prudent physician would do under same or similar circumstances is, number one, to have the proper index, what we call index of suspicion for a stroke. You don’t diagnose what you don’t think of. You have to have it |7on your list of possibility. So, number one, you have to be able to look at any [constellation] of sign and symptoms and if there’s any suggestion that a stroke may be a possibility, then, of course, the doctor has to have that on their list of possibilities. We call that differential diagnosis.
So, the standard of care requires an emergency physician, who is presented with a patient with suspected stroke, to. have stroke on their differential diagnosis.... Standard of care requires an emergent, a rapid, finger-stick blood sugar. If you suspect a stroke in a patient, you have to get it a finger stick, because a low blood sugar can cause stroke-like symptoms.
[[Image here]]
So, you always check the blood sugar before you send a patient to the CT scan. But the next step is you get a stat CT scan.
[[Image here]]
Standard of care requires in the suspected stroke to get an EKG.... You get a blood count. You get clotting tests. You get chemistry panel.... You check sodium potassium. Check kidney function. And then you get cardiac enzymes.
Dr. Kennedy then stated that the LOSGH medical records reflected that the only diagnostic test performed on Mr. Wood was the CT scan, and opined that the failure to perform additional diagnostic testing was a breach of the. standard of care by Dr. Humphries, as was her failure to have an adequate suspicion for a stroke, so she would take the correct action. He also stated that if the patient meets the criteria for a stroke, the emergency room physician should administer a “clot buster” medication within an hour. Dr. Kennedy said that, given the symptoms of hypertension, headache, and visual problems that Mr. Wood was experiencing when he went to the emergency room, his ease was *1112 “screaming stroke.” He discussed Tinti-nalli’s Emergency Medicine, an authoritative text for emergency medicine practitioners, and concluded that it supported his opinion that the defendants had breached the standard of care in their treatment of Mr. Wood.
The next expert witness to testify for the plaintiffs was Dr. Lanny Jay Turkew-itz, a neurologist with 32 years of practice. Currently practicing at Baptist Hospital in Nashville, Tennessee, he had been director of the stroke program at Charity Hospital in New Orleans before Hurricane Katrina. Dr. Turkewitz had practiced at two of the hospitals where Mr. Wood was treated following his stroke, i.e., St. Charles Parish Hospital and St. Anne General Hospital in Lafourche Parish. He remembered Mr. IsWood’s case very well, because it was a difficult stroke case, and Mr. Wood did not do well. Shown an MRI scan of Mr. Wood from 2007, Dr. Turkewitz pointed out the brain tissue that had died and said that the size of the stroke would have been less if Mr. Wood’s blood pressure had been maintained. He said that, especially in hypertensive patients like Mr. Wood, it was important to maintain the blood pressure and not lower it at all, because even a small drop in' blood pressure could be significant-in a stroke situation. He also stated that if Dr. Humphries had simply covered and uncovered each eye, she would have realized that Mr. Wood’s peripheral vision deficit was in the right quadrant of both eyes, which meant it was a problem in the brain, not an ophthalmologic condition. Dr. Turkewitz first saw Mr. Wood about six p.m. on March 30, 2005, at St. Anne General Hospital, eleven hours after he had been discharged from the LOSGH emergency room. He believed Mr. Wood was already experiencing a stroke when seen by Dr. Humphries at LOSGH, but her failure to conduct certain tests or to do them correctly led her to misdiagnose his condition. By the time Dr. Turkewitz saw Mr. Wood that evening, he was exhibiting all of the classic signs of a full-blown stroke that had begun hours earlier.
Dr. Richard Sobel, an emergency physician for 30 years, also testified on behalf of the plaintiffs. He defined emergency medicine as the science of the initial evaluation and stabilization of patients at the emergency department. In his opinion, the care provided to Mr. Wood at LOSGH did not comply with the standard of care that was reasonable under the circumstances of Mr. Wood’s presentation to the emergency room of LOSGH that day, including the patient examination and workup, the approach to the differential diagnosis of the patient, and the discharge from the emergency room with a referral to an ophthalmologist. He said that, based on Mr. Wood’s symptoms when he arrived at the emergency room, Dr. Humphries should have had stroke as number one on her differential diagnosis list. In fact, he said stroke was really the only working diagnosis that the emergency physician should have been dealing with as an emergency medical condition. He stated there were an array of tests that were required in the |9workup of a stroke, reiterating the types of tests described by Dr. Kennedy. Dr, Sobel called it “a whole huge database that we emergency physicians are expected to do under the standard of care when we’re suspecting a stroke.” He said a crucial test was the “cover and uncover” test of both eyes, called visual field testing by confrontation. The standard of care required Dr. Humphries to do this exam properly and document it fully. It also required that she consult a neurologist to determine the proper treatment. Dr. So-bel stated that:
[N]umber one, ... a stroke should have been diagnosed, period. [An] ER doctor *1113 should not have had to rely on anybody else to make the diagnosis of a stroke or a suspected stroke. It should have been found by a good neurological exam, careful consideration of the history of the patient, and his risk factors.
Dr. Sobel said that a thorough exam would have revealed that “[t]his patient is predestined to be a transfer” to another facility with the ability to provide the necessary treatment.
Dr. Scott Sondes, a physiatrist, provided expert testimony for the plaintiffs as a medical doctor with a specialty in physical medicine, rehabilitative medicine, and emergency room care. He agreed with the opinions expressed by the other doctors whose testimony preceded his, and stated:
If we look at this scenario, we have a patient who has high blood pressure. They have a headache and they have vision changes. They take their blood pressure medicine, the headache goes away. The vision changes improved. Then they come back with more vision changes and a worse headache. I don’t need anything else to say [that] I want to get a neurologist for this patient.
The first physician to testify on behalf of the defendants as an expert in emergency room medical care and treatment was Dr. Luis Camero, who served on the Board of directors of the two most recognized institutions in the world in emergency medicine, The American College of Emergency Physicians and The American Academy of Emergency Physicians. Dr. Camero explained that the duties and responsibilities of emergency medicine doctors required each of them to be “a jack of all trades.” He said emergency room doctors need to be able to evaluate whatever “pops through our door” and sometimes treat it, sometimes admit to the hospital, sometimes refer to the Inappropriate facility, and other times curtail life-threatening emergencies. They must also make sure that patients have follow-up and know what they are supposed to do when they leave the emergency department. Dr. Camero was a member of the Medical Review Panel that evaluated the care given to Mr. Wood by Dr. Humphries and LOSGH; the three-member panel unanimously agreed that neither of the defendants had breached the standard of care for emergency medicine in treating Mr. Wood. He said that he believed Dr. Hum-phries went “above and beyond the call of duty” and standard of care by personally arranging a follow-up appointment with an ophthalmologist, doing a very thorough physical exam, and providing immaculate documentation, including the pertinent positives and negatives during her examination of Mr. Wood. He stated that Dr. Humphries’ notations on Mr. Wood’s medical record indicated that she had performed a bilateral examination and found that only one eye was affected by a visual defect. He also said that he found it reasonable that Dr. Humphries had put an eye problem high on her differential diagnosis, while putting ischemic stroke low on the differential, because of the lack of focal neurological deficits in the findings based on a very, very thorough physical exam. Dr. Camero agreed that the tests discussed by the plaintiffs’ experts and the medical reference book by Tintinalli described the standard of care “if the full-court press is going on because someone’s having a stroke.” However, not all of those tests help the physician diagnose a stroke. For instance, while an EKG was stated as a component of the standard of care, due to the possibility of atrial fibrillation, the EKG was not the only way to make that diagnosis, which could be determined clinically. If the physician listened to the heart and heard a very regular rhythm, that was sufficient to determine *1114 that there was no irregularity, and an EKG would not be called for. Dr. Camero stated that many of the tests described as part of the standard of care were applicable only if a stroke were strongly suspected; if a stroke were just remotely suspected, the emergency room doctor should do a very good physical exam and a CT scan, as was done in this case. He said that, having done those tests and having concluded that Mr. Wood was not having a stroke, Dr. InHumphries did not breach the standard of care by discharging him with the instructions given.
Dr. Richard McConnell, a board certified emergency physician who also participated in the medical review panel pertaining to this case, testified for the defense as a medical doctor with a specialty in emergency room medicine. He reiterated the panel opinion and his own opinion that neither of the defendants breached the standard of care. Specifically, he said that, given Mr. Wood’s history of headaches and a recent severe headache gradually resolving, “[ajnyone presenting like this, there are multiple diagnoses that should be considered.... You have immediately two reasons why he could be having headaches again,” which were migraines and not taking his blood pressure medicine. He stated that Dr. Humphries had performed a complete physical exam, which was normal with the exception of the loss of vision in the right eye and the headache. Based on the emergency room records, he concluded that Dr. Humphries had correctly performed a confrontational exam, which revealed only a moderate disturbance in the right eye at the right side. This test further reduced the possibility of a stroke, which would show an area of blindness in the same visual field of both eyes, rather than a visual defect in only one eye. The normal CT scan further reduced the possibility of bleeding, tumor, or stroke. Based on the patient history and physical exam, he believed that Dr. Humphries’ ultimate clinical impression of, “headache, rule out migraine versus secondary to uncontrolled high blood pressure” and a right peripheral visual field deficit, was a reasonable impression that met the standard of care. Dr. McConnell said various approaches to Mr. Wood’s further treatment would have met the standard of care, including the approach taken by Dr. Humphries. Dr. McConnell said several times that Tintinalli’s medical reference book did not establish the applicable standard of care for emergency room physicians, explaining:
Emergency medicine textbooks are not authoritative. They are written for the purpose of being in the hands of practicing emergency doctors to be used to assist them in making decisions in managing the patients in the ER. They are not written for the purpose of establishing standard of care.
[[Image here]]
This is not standard of care. The textbook is not standard of care. These are suggestions for treating physicians. They’re not written to be the standard of care.
He said the standard of care was what a reasonable physician, like himself, practicing emergency medicine, would do in a similar situation for the particular patient that is being evaluated. Dr. McConnell was questioned about certain of the recommendations in an article in Stroke, a journal published by the American Heart Association, and agreed that this article discussed “General Supportive Care in the Treatment of Acute Complications of Stroke,” which established the standard of care for treatment of a stroke after a diagnosis has been made. However, it did not establish the standard of care for diagnosing stroke in every case. Dr. McCon *1115 nell said that in this case, with this particular patient, this history, this physical exam, and the results of the eye examination, it was not necessary to do eardio monitoring and lab work, as the Stroke article and Tintinalli’s textbook might otherwise recommend.
In ruling on the JNOV, the trial court stated:
I think the jury made a mistake in this case. I think the jury was confused between standard of care and burden of proof. I think the jury made a mistake. I think the jury — I mean, nobody disputed what the standard of care is in this case. None of the doctors, none of the people on the witness stand had anything different to say about what the standard of care was. I mean, they couldn’t. They couldn’t say that with a straight face from the witness stand.
The standard of care when a person walks into an emergency room complaining of visual defects and a headache that woke him up at whatever time, three, two, three o’clock in the morning, and about what you do with that person is what this case was all about, and all of the doctors that testified talked about what happened and whether they thought — what the testimony of Camera and McConnell was about was whether or not Dr. Humphries ... did what [she was] supposed to do with what was presented to [her]. So, there was no dispute about the standard of care.
So, did the plaintifffs] carry their burden of proof? I think they did. I think the plaintiff[s] proved, even through the testimony of Camera and McConnell, ... what the standard of care was. So, I don’t think there’s any question that no reasonable juror — of course, the law doesn’t talk about a confused juror — but a reasonable juror should have been able to comprehend that the standard of care was not the issue in this case. And they couldn’t get to that point.
[[Image here]]
In this case I think the jury made a mistake. I think that the | ^inferences and the facts are overwhelmingly in favor of the plaintiff[s] on the point of whether the plaintiff[s] carried their burden of proof on the standard of care. So, the JNOV is granted to that point.
After reviewing the testimony of the medical experts in this case, we are forced to disagree with the trial court’s conclusion that no reasonable juror could conclude that the plaintiffs had failed to establish the standard of care applicable to Dr. Humphries. Although the experts were in agreement about certain factors making up the standard of care in this situation, they disagreed on many other factors. For instance, although the medical experts agreed that Mr. Wood’s history and symptoms indicated that he might be having a stroke when he entered the emergency room, they disagreed on whether other diagnoses, such as recurrent migraines, failure to take his blood pressure medicine, or the presence of a detached retina, could also reasonably be high on the list of possibilities in the differential diagnosis. Some of the experts, particularly Drs. Kennedy and Sondes, stated that the first action that should have been taken in this situation was to consult a neurologist or transfer Mr. Wood to a better-equipped hospital, while others believed such steps were necessary only if the CT scan and other physical tests were consistent in pointing to a stroke as the cause of Mr. Wood’s symptoms. The experts who testified on behalf of Mr. and Mrs. Wood listed numerous tests, such as an EKG and eardio monitoring, that they felt were necessary components of the standard of care whenever a stroke was suspected; the physicians testifying on behalf of the doctor did *1116 not agree that these tests were always needed or that they should have been performed in this case. The experts also disagreed on whether it was ever acceptable to discharge a patient when the possibility of a stroke had not been completely eliminated from the differential diagnosis, no matter how remote that possibility was after performing various diagnostic tests and observing the patient. Given this considerable disagreement among the medical experts, a reasonable person could conclude that the plaintiffs had not established the standard of care applicable to Dr. Humphries by a preponderance of the evidence presented at trial. Therefore, we conclude that the court’s granting of the motion for a JNOV constituted legal error and | Mmust be reversed.

Motion for New Trial

Under LSA-C.C.P. art. 1811(C)(1), if the trial court grants a JNOV, it must also rule on whether a new trial should be granted in the event the appellate court vacates or reverses the JNOV. The trial court must also specify the grounds for the grant or denial of the motion for a new trial. The trial court in this case stated that its reasons for granting the new trial were the same as those justifying the entry of the JNOV. Therefore, the court satisfied the requirements of Article 1811(C)(1). According to Article 1811(C)(2), if the motion for a new trial has been conditionally granted and the JNOV is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise. Therefore, we must consider whether the conditional granting of the motion for a new trial was appropriate in this case.
As provided in LSA-C.C.P. art. 1972, a new trial shall be granted, upon contradictory motion, where (1) the verdict or judgment appears clearly contrary to the law and evidence; (2) important evidence is obtained after trial; or (3) the jury was either bribed or behaved improperly. These provisions constitute the peremptory grounds for granting a motion for new trial. Pursuant to LSA-C.C.P. art. 1973, a new trial may be granted if there is good ground for it, except as otherwise provided by law. This article provides the trial court with discretionary authority to grant a new trial.
The standard of review of a judgment on a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. See Magee v. Pittman, 98-1164 (La.App. 1st Cir.5/12/00), 761 So.2d 731, 746, writ denied, 00-1694 (La.9/22/00), 768 So.2d 31, 602. The breadth of the trial court’s discretion to order a new trial varies with the facts and circumstances of each case. Horton v. Mayeaux, 05-1704 (La.5/30/06), 931 So.2d 338, 344. When the trial court grants a new trial based on Article 1972’s mandatory ground of a jury verdict being contrary to the law and the evidence, the appellate court must review the record in view of the specific law or evidence found to conflict with the jury verdict to determine whether the trial court 11sabused its discretion in granting a new trial. Martin v. Heritage Manor South, 00-1023, (La.4/3/01), 784 So.2d 627, 637.
A motion for new trial requires a less stringent test than a motion for JNOV, as its determination involves only the issue of a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Law v. State ex rel. Dep’t of Transp. & Dev., 03-1925 (La.App. 1st Cir.11/17/04), 909 So.2d 1000, 1006, writs denied, 04-3154 and 04-3224 (La.4/29/05), 901 So.2d 1062. Whether to grant a new trial requires a discretionary balancing of many factors. Id. In deciding whether to grant *1117 a new trial, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and it may evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. Joseph, 772 So.2d at 104. A motion for new trial based solely on the ground of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84, 93, citing Gibson v. Bossier City Gen. Hosp., 594 So.2d 1332 (La.App. 2nd Cir.1991).
The trial court in this case conditionally granted the new trial on the same grounds on which the JNOV was granted, namely, that the jury made a mistake in concluding that the plaintiffs had not established the standard of care applicable to Dr. Hum-phries by a preponderance of the evidence. The trial court found that the evidence establishing the standard of care was so overwhelming that no reasonable juror could have concluded that the plaintiffs had not proved that element of their case. Examining the trial court’s conclusion in the light of the peremptory and discretionary grounds for granting a motion for new trial, it appears that the motion for new trial was granted because the jury verdict was contrary to the evidence presented by Mr. and Mrs. Wood concerning the standard of care. If that were the case, LSA-C.C.P. art. 1972 would mandate the granting of a new trial.
11fiHowever, this court’s review of the testimony of all the medical experts led us to conclude that there was significant disagreement among them as to the applicable standard of care, such that a reasonable juror could find that this element of the plaintiffs’ case had not been established. In a number of cases, courts have concluded that when a JNOV is reversed based on the appellate court’s determination that the jury’s verdict was reasonably supported by the evidence presented at trial, the alternative request for a new trial should also be denied or reversed on appeal. See Trunk v. Medical Ctr. of Louisiana at New Orleans, 04-0181 (La.10/19/04), 885 So.2d 534, 540 (“Because we have previously concluded [in reversing the JNOV] that the jury’s verdict was reasonable in light of the evidence presented, we find that plaintiff is not entitled to a new trial.”); Davis v. Witt, 02-3102 (La.7/2/03), 851 So.2d 1119, 1134 (“When any fair interpretation of the evidence supports the jury’s verdict, the grant of a new trial must be reversed.”); VaSalle v. Wal-Mart Stores Inc., 01-0462 (La.11/28/01), 801 So.2d 331, 342 (“Because we have previously concluded [in reversing the JNOV] that the jury’s verdict is reasonable in light of the evidence presented, we find that plaintiffs are not entitled to a new trial.”); Yohn v. Brandon, 01-1896 (La.App. 1st Cir.9/27/02), 835 So.2d 580, 587, writ denied, 02-2592 (La.12/13/02), 831 So.2d 989 (“As with the supreme court in VaSalle, we have ‘concluded that the jury’s verdict was reasonable in light of the evidence presented,’ and [therefore,] the plaintiff ‘was not entitled to a new trial.’ ”); In re Gramercy Plant Explosion at Kaiser, 04-1151 (La.App. 5th Cir.3/28/06), 927 So.2d 492, 502, writ denied, 06-1003 (La.6/14/06), 929 So.2d 1271 (“[W]hen a JNOV is reversed on determination that the jury’s verdict was reasonable in light of the evidence presented, the conditional new trial also should be reversed.”).
We find such reasoning is applicable to this case. In reversing the trial court’s grant of a JNOV, we determined that the evidence in the record supported the jury’s verdict that the plaintiffs had failed to *1118 prove the standard of care applicable to the defendants’ treatment of Mr. Wood. We further found that the jury’s verdict was | ^reasonable, given the diverse opinions expressed by the medical experts. Thus, the jury’s verdict “was supportable by any fair interpretation of the evidence.” See Davis, 774 So.2d at 93. Therefore, Mr. and Mrs. Wood were not entitled to a new trial on the basis that the jury’s verdict was contrary to the law and the evidence.
Furthermore, our review of the record discloses no other grounds — peremptory or discretionary — upon which a motion for new trial could have been granted. See LSA-C.C.P. arts. 1972 and 1973. “A conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur.” Joseph, 772 So.2d at 105. Accordingly, we find that the trial court abused its discretion in conditionally granting the plaintiffs’ motion for a new trial.
CONCLUSION
For all of the above reasons, the June 20, 2011 judgment of the trial court, granting a JNOV in favor of Mr. and Mrs. Wood and conditionally granting a new trial, is hereby reversed, and the jury’s verdict is reinstated, together with the April 13, 2011 judgment rendered in accordance with the jury’s verdict. All costs of this appeal are assessed to Mr. and Mrs. Wood.
REVERSED; JURY’S VERDICT REINSTATED; JUDGMENT OF APRIL 13, 2011 REINSTATED.
CARTER, C.J., concurring with reasons.

. As a result of this dismissal, we will address the standard of care in this case only as it applies to Dr. Humphries.