# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 17-440


**WILLIE BROWN, JR.**

**VERSUS**

**BREAUX BRIDGE VENTURES, LLC**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 81561
HONORABLE ANTHONY THIBODEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## D. KENT SAVOIE
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Van H. Kyzar, Judges.


**REVERSED AND RENDERED.**

**Nelson W. Wagar, III**
**Sarah W. Hickman**
**Wagar Richard Kutcher Tygier & Luminais, LLP**
**Two Lakeway Center, Suite 900**
**3850 N. Causeway Boulevard**
**Metairie, LA 70002**
**(504) 830-3838**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Breaux Bridge Ventures, LLC d/b/a Silver's Casino**

**R. Scott Iles**
**P. O. Box 3385**
**Lafayette, LA 70502**
**(337) 234-8800**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Willie Brown**

**SAVOIE, Judge.**

In this slip and fall case, Defendant Breaux Bridge Ventures, LLC d/b/a Silver's Casino appeals the trial court's JNOV granted in favor of Plaintiff Willie Brown, Jr. and judgment increasing the jury's award of $25,000 for "past and future physical and mental pain and suffering, and physical impairment" to $250,000. For the following reasons we reverse the JNOV granted in favor of Mr. Brown and reinstate the jury's verdict.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Brown alleges that he was injured when he fell in the parking lot of Silver's Casino on October 13, 2013. He was sixty-five years old at the time. On that date, Mr. Brown and his wife were patrons of the casino. Per Mr. Brown, the casino unexpectedly lost electricity and he and his wife exited to the parking lot at the direction of casino management. He alleges that it was dark outside at the time, and that he stumbled and fell as he walked back toward the casino when patrons were allowed to reenter. He filed suit against Silver's Casino on June 9, 2014. Trial was held September 29-30, 2015.

At trial, Mr. Brown testified that on the day of the incident, he fell, hit his head "hard," "twisted," and fell on his shoulder. He stated, "right at that moment, I just fell. I didn't feel any pain hardly." Mr. Brown did not seek medical treatment that day.

Mr. Brown testified that the next morning at about 6:00 a.m. he woke up with "a big old knot, and it was like a big scab. It was turning. And my vision in this right eye was blurred." His wife thereafter brought him to the emergency room at St. Martin Area Hospital. Mr. Brown testified that his initial complaints were his head injury and blurred vision, that a CT scan was performed at the hospital, and that he was advised to see an ophthalmologist or an optometrist

regarding his blurred vision. According to the medical records from St. Martin Area Hospital, Mr. Brown was discharged the same day with a diagnosis of a head abrasion, and he was prescribed ibuprofen.

According to Mr. Brown, a few days later his neck and shoulder started hurting and he noticed some swelling. When asked how it felt, he stated, "if I'd bend my neck, I could feel it. It was like a lump right there. And I still have it. It would just bother me, and my shoulder too." He testified that he did not have any pain in his neck or shoulder before the incident.

Mr. Brown's attorney referred him to Dr. Mathew Abraham. Dr. Abraham's video deposition as well as his medical records were submitted into evidence. Mr. Brown first saw Dr. Abraham on October 22, 2013. Dr. Abraham testified that at this time, Mr. Brown explained the incident at issue indicating that he had hit his forehead and had some swelling, and that when he fell, he braced himself with his left arm and rotated to his right, impacting his right knee. The medical record from this date notes that Mr. Brown reported "some cervical discomfort [,] worse over the left side and mainly involving the left shoulder and left chest wall." Dr. Abraham testified that Mr. Brown "had a contusion over the right forehead and complained of occasional visual disturbances. He had some cervical discomfort after the injury. He had a discomfort involving his left shoulder and interior chest wall. And he had [an] abrasion over the right knee[.]"

Dr. Abraham stated that he initially believed Mr. Brown had a soft tissue injury, specifically, "sprains with some myofascial strains" that could improve over time with therapy, at an average of three to six months. Dr. Abraham therefore recommended physical therapy as well as an evaluation by an ophthalmologist. As of the date of Dr. Abraham's initial exam, Mr. Brown reported he took the following medications: Lisinopril, Motrin, Ambien, and

2

Mobic, as needed. Dr. Abraham testified he did not know what provider had proscribed Mobic, which is a medication for pain.

Mr. Brown testified that he thereafter attended physical therapy at Dr. Abraham's clinic four times a week initially, and then three times a week, while under Dr. Abraham's care. He stated that the physical therapy "worked a little while, and then I started having a lot of swelling. And they would come in, and the lump in my neck, it would go down and it would come back up again. And it started hurting."

Mr. Brown saw Dr. Abraham again on November 19, 2013. Dr. Abraham testified that at this time, Mr. Brown

> was worried about his left shoulder, having continued pain in the cervical area. He had limited improvements with therapy but it wasn't worsening. He had an examination with the ophthalmologist. He said his knee pain was improved. The chest wall discomfort had somewhat improved. So he had some areas of improvement and other areas that were not.

Dr. Abraham's medical report from November 19, 2013, notes "[l]eft cervical and upper thoracic myofascial strain involving the left shoulder." It further states that "therapeutic modalities" for his complaints would continue, but that if there was no significant improvement over the next few weeks, an evaluation with a specialist may be considered. Dr. Abraham additionally prescribed Lortab.

Mr. Brown's next appointment with Dr. Abraham was December 17, 2013. Dr. Abraham testified that at this time Mr. Brown "had some improvements of the thoracic and cervical area, but still had discomfort and pain. The discomfort was improving slowly." Dr. Abraham also noted that Mr. Brown's primary complaints were tenderness on the left side of his neck and left shoulder. He further indicated that Mr. Brown had regularly attended physical therapy since his initial

3

appointment. Dr. Abraham's medical record from that date reflects that Mr. Brown reported seeing an ophthalmologist and that he had fewer complaints of "floaters." The report also states that Mr. Brown was to continue his current medications, as well as "[c]ontinue therapeutic modalities, which are having benefit."

Dr. Abraham saw Mr. Brown again January 14, 2014. Dr. Abraham's medical record from this date states:

> Mr. Brown is here today for follow-up evaluation. He has had improvements over the past month. The cervical discomfort is improved significantly, as well as the left upper myofascial strain. He has some discomfort over the anterior aspect of the neck, where it attaches to the clavicle, but otherwise he feels better.
>
> . . . .
>
> He had some tenderness over the anterior cervical musculature near the clavicular area. That being said, there was no instability of the clavicle. This is also improvement. He had minimal discomfort or tenderness at all over the left cervical and upper thoracic area at the time of exam.

The January 2014 medical record further reflects that Lortab was discontinued, and that Mr. Brown would take non-steroidal anti-inflammatory medication as needed. Dr. Abraham testified that Mr. Brown was still attending physical therapy as well.

Mr. Brown next saw Dr. Abraham on February 18, 2014. Dr. Abraham's medical report from this date states Mr. Brown "has continued pain over his left shoulder, especially with elevation of the shoulder above horizontal. The pain is not improved[,]" but his cervical pain "had significant improvements with therapy." Dr. Abraham testified that at on this date, he recommended an MRI of Mr. Brown's left shoulder, which revealed "a mild . . . labral tear." Based on the results of the MRI, Dr. Abraham referred Mr. Brown to Dr. Louis Blanda, an orthopedic surgeon.

4

Mr. Brown saw Dr. Abraham again in March 2014. At that time he had not yet seen Dr. Blanda. Dr. Abraham's report from that date reflects "significant pain over his left shoulder," and "cervical pain that has improved." Mr. Brown's last visit with Dr. Abraham was May 20, 2014, at which time Mr. Brown was treating with Dr. Blanda. Due to Dr. Blanda overseeing his care, no follow up appointments were scheduled.

Mr. Brown testified at trial that after the several months of treating with Dr. Abraham, his neck was still hurting, and that his worst problem "three, four, five months, after the accident" was his neck. When asked to describe what his neck felt like then, Mr. Brown stated:

> I can't turn my head real fast. I went to the doctor one day, and he did a little test. He just took his hand and put it on the top of my head and pushed down. And believe me it hurt. When I go to bed at night, I can't rest. I wind up getting out of bed several times a night. I go cut the TV on, and I sit down in a recliner. And that's been going on for quite a while.

Mr. Brown first saw Dr. Blanda on April 17, 2014. Dr. Blanda's video deposition and medical records were admitted into evidence. Dr. Blanda's medical record from that date states:

> Patient words: This is a 65 year old right handed male referred by Dr. Matthew Abraham for evaluation of left shoulder complaints. . . . He was initially concerned about his head injury and a few days later he began with left shoulder pain.
>
> The patient retained the services of Scott Isles who sent him to see Dr. Abraham who treated him conservatively with medications and physical therapy. This was not working and the patient was sent for a left shoulder MRI on February 20, 2014. He was told he had a bad tear in his shoulder and was referred here for orthopedic evaluation.
>
> The patient is complaining of an aching, burning pain in his left shoulder that he rates an 8 on a scale of 0-10. He has a tingling sensation and pins and needles sensation in his shoulder.

Dr. Blanda testified that on April 17, 2014:

I examined his neck and left shoulder and his arm. In the neck area, he had restrictive range of motion. A maneuver, which is a compression-type test, did produce pain in both shoulders and arms. He had muscle spasms in his neck muscles. Range of motion, as mentioned was painful, especially with his bending forward. His shoulder showed some weakness in the general area of the shoulder girdle. He had some weakness with grip and also with the bicep muscle.

. . . .

The shoulder itself showed some weakness with abduction, meaning his ability to lift his shoulder, and also some pain with range of motion both active, which is the patient's lifting of the arm, as well as my range of motion by bringing his arm through rotation and lifting. There was also some mild stiffness, and he had tenderness in the AC joint, which is the joint where the collarbone attaches to the shoulder.

So I felt he had both problems with the neck and the shoulder. He had some neurological changes as well as some weakness in the primary shoulder exam itself.

Dr. Blanda also testified that he had reviewed the MRI of Mr. Brown's left shoulder previously ordered by Dr. Blanda, noted that it "showed some degenerative changes," and stated:

Dr. Abraham thought he had a bad tear, but it looked like he had mostly arthritic change in the . . . joint where the collarbone attaches, as well as the ball-and-socket part of the shoulder itself.

There was some suspicious tear in what's called the labrum, which is the ligament part of the shoulder. But I think the major concern was the rotator cuff, which was mainly inflamed and had tendinitis-type changes rather than a tear itself.

Dr. Blanda further testified that, in his opinion, there was not any injury to the shoulder that would require shoulder surgery, and that his "main concern . . . was his exam was really pointing more to a neck problem, than the shoulder itself[,]" based upon the "reflex changes with the absent biceps[, which] usually means something going on around the 6 - - the C5-6 disk with perhaps a lesion or compression in the C6 nerve root." Dr. Blanda then recommended an MRI of Mr.

6

Brown's neck. The medical record reflects Dr. Blanda further gave prescriptions for Norco and Elavil.

Mr. Brown saw Dr. Blanda again on May 6, 2014, at which time an MRI of Mr. Brown's neck was performed. Dr. Blanda testified that the MRI "show[ed] a herniated disc at C5-6[,]" as well as "some degenerative changes and spinal stenosis in the level above it, at the C4-5 level. And it was more severe on the left, which I think would fit very consistently with his complaints and his physical exam." Dr. Blanda testified that at the May 6, 2014 appointment, Mr. Brown's physical exam was the same as the initial exam, and that he was going to consider an "anterior cervical diskectomy [sic] and fusion" ("ACDF"). When asked to describe this procedure, Dr. Blanda testified:

> A. . . . . It's called an anterior diskectomy, meaning we go in surgically from the front and remove the offending disc or bone spurs that's pressing on the spinal cord or nerves and fuse the disc.
>
> Q. Is that a major surgery?
>
> A. It's big, yes sir.
>
> . . . .
>
> Q. When a patient has an anterior cervical diskectomy and fusion with plates and grafts at the C4-5 and C5-6 level, if you take into consideration the surgeon's cost, anesthesia, the hospital cost, and the bone grafts, things like that, the instruments, in today's dollars, those are probably in the $85,000 range?
>
> A. I think that's pretty accurate, yes, sir.

Dr. Blanda testified that, following the May 6, 2014 exam, he recommended that Mr. Brown undergo an EMG study and nerve conduction to confirm any nerve damage. He explained that a neck surgery is done either because of nerve damage or compression or because of "intractable pain, which is not relieved by conservative treatment." With respect to Mr. Brown's EMG, Dr. Blanda testified,

that "it very accurately confirmed that he had a left C5-6 radiculopathy coming from the C5-6 disc herniation."

Dr. Blanda next saw Mr. Brown on June 12, 2014, at which time he discussed the results of the EMG study with Mr. Brown and recommended the ACDF surgery. The medical record from that date noted that Mr. Brown's chief complaint was neck and arm pain and that he "is doing a little better with his pain medications but doesn't want to stay on narcotics." Dr. Blanda saw Mr. Brown again on September 23, 2014, wherein Mr. Brown complained of continued neck symptoms, left shoulder pain, and left and right radicular symptoms, but worse on the left. Mr. Brown's pain medications were refilled on this date.

Mr. Brown saw Dr. Blanda again on February 26, 2015. The medical record from that date reflects Mr. Brown's complaint of neck pain, and states

> The neck pain has been occurring in a persistent pattern for years. The course has been constant. The neck pain is described as moderate to occasionally severe. . . . He states no real change in his symptoms. He states cortisone injection received last visit did not last long. He states his meds helped considerably. He also states that lately he's been having trouble sleeping.

When asked about this record entry, Dr. Blanda testified that the reflected history of Mr. Brown's current illness was not in Mr. Brown's words, but rather Dr. Blanda's statement after reviewing notes from prior visits. He further explained that his reference to "for years," meant only from the incident in 2013 through 2015, and not before. The February 26, 2015 report further indicates that the treatment plan would remain in effect and that Mr. Brown could refill his pain medication.

Dr. Blanda testified that he last saw Mr. Brown on August 25, 2015. As of this date, Mr. Brown had not undergone surgery, and still had arm, shoulder, and neck pain. Dr. Blanda indicated that his examinations of Mr. Brown since the first

examination in April 2014, "remained fairly consistent, although there were probably some ups and downs as far as the severity."

When asked whether Mr. Brown would continue to have discomfort and pain for the rest of his life, if he did not have the ACDF surgery, Dr. Blanda stated:

> It's hard to predict accurately. But, for the most part, it probably will. I mean, he's already in his 60s, I think. These things last indefinitely without definite treatment. . . . It's certainly the patient's choice. He can choose to live with it. But if he's going to get any better, it's going to probably take surgery to correct it.

Dr. Blanda also testified that during the course of his treatment of Mr. Brown, Mr. Brown obtained a second opinion from Dr. Romero, and that Dr. Blanda had received Dr. Romero's report. According to Dr. Blanda, Dr. Romero suggested that it was Mr. Brown's shoulder that was referring pain to his neck, rather than his neck referring pain to his shoulder, but that Dr. Romero agreed that there was cervical disc radiculopathy. Dr. Blanda indicated that Dr. Romero thought that injecting the shoulder might relieve the pain, and that an injection should be attempted before neck surgery.

As of the date of trial in September 2015, Mr. Brown had not yet undergone the ACDF surgery recommended by Dr. Blanda fifteen months prior. When questioned as to why not, Mr. Brown explained that his wife had had to have open heart surgery, as well as have her gall bladder removed shortly after the heart surgery. He stated "Eventually, I'm going to have the surgery. But I don't want to be tied down. And my wife have [sic] problems right now. If I go into the hospital and she's there by herself, my household ain't gonna' function." Mr. Brown further indicated that as soon as his wife was better, he would have the recommended surgery.

Also during trial, Mr. Brown indicated that he had suffered a right knee injury in 1995 and that he medically retired after that; therefore, he received

9

retirement income.  Mr. Brown's wife did not work.  Mr. Brown further testified at trial as follows:

Q.  Okay.  Mr. Brown, what kind of things did you enjoy doing before this accident that you don't do now or do less of?

A.  I sure don't go fishing anymore.

Q.  Did you fish a good bit before your fall?  Did you fish a bunch before you fell?

A.  It probably had been awhile before I had went.

Q.  And now since this accident?  Have you been wetting the line much?

A.  No.

Q.  What keeps you from doing so?

A.  Well, my wife.  I like to be around the house, so I don't like to get out too far.  I was out one day, and I got home and found her on the floor.  So I stay around the house.

Q.  Your injuries because of this accident, your neck problem, does that affect how you interact with your family and friends?

A.  I would say, yes, because I don't – I don't go around like I used to.

. . . .

Q.  How did you sleep before this accident happened?

A.  I slept good.

Q.  What's a night sleeping with your neck pain now?

A.  In numbers, from one to ten?

Q.  Yes, sir.

A.  On a scale, I would say eight.

Q.  Were you in much pain because of your knee injury you had in the past before this accident happened?

A.  No.

Q.  How about now because of your injuries from this accident? Are you in pain?

10

A. I just have to watch how I move my neck. No rough stuff. That's for sure.

Q. If you could, can you describe what discomfort level is in your neck now from a scale of one to ten?

A. It's – I would say seven.

Q. What's the worst its been since this accident on a scale of one to ten?

A. It varies. Some nights, it's – I just can't sleep. And when I try to sleep, it start hurting. I can't get a position in bed. Even now, on the recliners, I can't stay on that too long, because I'm sitting back and my neck start hurting. I got to get pillows. I just keep moving around.

Following trial, a jury returned a verdict allocating Mr. Brown with 45% fault and Silver's Casino with 55% fault. The jury further awarded damages totaling $152,526.66, which included $86,000 for "future medical expenses," $25,000 for "past and future physical and mental pain and suffering and physical impairment," and $25,000 for "past and future loss of enjoyment of life."

On December 28, 2015, the trial court signed a judgment that included $86,000 for "future medical expenses," $25,000 for "[p]ast and present general damages," and "$25,000 in future general damages." The judgment also reduced damages owed to Mr. Brown by the percentage of fault allocated to him.

Mr. Brown thereafter filed a motion for JNOV and alternative motion for new trial on January 21, 2016. The trial court rendered a ruling on March 21, 2016, denying the motion for new trial, but granting the motion for JNOV in part and increasing the award for "future general damages" to $250,000. Silver's Casino appealed.

On December 7, 2016, this court rendered an opinion concluding that the December 28, 2015 judgment did not properly correspond to the categories of damages awarded by the jury. *Brown v. Breaux Bridge Ventures, LLC*, 16-662

11

(La.App. 3 Cir. 12/7/16), 207 So.3d 1083. Therefore, this court concluded it lacked jurisdiction over the appeal as there was not a valid judgment, and the matter was remanded to the trial court with instructions to execute a judgment corresponding to the jury's verdict. *Id.*

The trial court executed a corrected judgment on December 15, 2016, reflecting the jury's allocation of fault and the damages awarded, and rendering Silver's Casino liable for a total of $83,899.11, which is 55% of the total damages awarded, in addition to interest and costs of the proceedings. The categories of damages awarded included: $86,000 in "future medical expenses;" $25,000 in "past and future physical and mental pain and suffering and physical impairment;" and $25,000 in "past and future loss of enjoyment of life."[1] The corrected

---

[1] The corrected judgment provides as follows:

The jury found each party negligent in causing the accident in the following percentages:

| Plaintiff Willie Brown, Jr. | 45% |
| Defendant Breaux Bridge Ventures, L.L.C. d/b/a Silver's Casino | 55% |

The jury then found that the following damages were sustained by Plaintiff Willie Brown, Jr. as a result of the accident:

| Future Medical Expenses | $86,000.00 |
| Past and Future Physical and And Mental Pain and Suffering, and Physical Impairment | $25,000.00 |
| Past and Future Loss of Enjoyment of Life | $25,000.00 |

The parties had previously stipulated to Past Medical Expenses, which totaled $16,525.00. Thus the following is the total amount of damages awarded:

**Total amount of Damages:** **$152,525.66**

Considering the reduction for comparative fault:

IT [IS] HEREBY ORDERED ADJUDGED AND DECREED, that there be judgment in favor of Willie Brown Jr. and against Breaux Bridge Ventures, L.L.C. doing business as Silver's Casino, in the amount of $83,889.11, together with judicial interest from the date of demand until paid.

12

judgment also rendered Silver's Casino liable for $3,384 for deposition fees that were taxed as costs of court.

Following the corrected judgment, Mr. Brown filed another motion for JNOV and alternative motion for new trial. Mr. Brown argued to the trial court that the jury's award of future medical expenses was inconsistent with the $25,000 award for "past and future physical and mental pain and suffering, and physical impairment" and therefore a JNOV was warranted. In its reasons for judgment granting the JNOV as to the award of "past and future physical and mental pain and suffering, and physical impairment," the trial court stated:

> This court finds that the jury abused its discretion in assessing this amount of damages. . . . [T]he jury awarded Plaintiff $86,000 in future medical expenses, which was the amount suggested at trial that a potential future surgery would cost. Based on this award, the court conclude[s] that the jury believed Plaintiff would benefit from such a surgery, thus awarding him the sum for the surgery. Nonetheless, the jury only awarded Plaintiff $25,000.00 for past and *future* physical and mental pain and suffering, and physical impairment. [Emphasis added [by the trial court].] The court finds that this award is much too low considering the physical and mental suffering Plaintiff may suffer while recovering from his future surgery, said surgery being contemplated by the jury in their award of future medical expenses.

On January 31, 2017, the trial court signed a judgment granting Mr. Brown's motion for JNOV in part and increasing the jury's award of $25,000 for "past and future physical and mental pain and suffering and physical impairment" to $250,000. The judgment denied the remainder of the motion for JNOV as to allocation of fault and also denied the motion for new trial.

Silver's Casino appeals challenging the trial court's granting of the JNOV and the increase of $25,000 for past and future physical and mental pain and suffering and physical impairment to $250,000. Mr. Brown does not seek review of the trial court's denial of the remainder of his motion for JNOV or the denial of

his motion for new trial. Therefore, we consider only the trial court's JNOV with respect to the award of "past and future physical and mental pain and suffering and physical impairment."

## ANALYSIS

As recently stated by our supreme court in *Pitts v. Louisiana Medical Mutual Insurance Company*, 2016-1232, pp. 7-8 (La. 3/15/17), 218 So.3d 58, 64-65 (emphasis added):

> A JNOV is a procedural device authorized by La. C.C.P. art. 1811, by which the trial court may modify the jury's findings to correct an erroneous jury verdict. *Wood v. Humphries*, 11-2161 (La.App. 1 Cir. 10/9/12), 103 So.3d 1105, 1109, *writ denied*, 12-2712 (La. 2/22/13), 108 So.3d 769. The criteria for granting a JNOV was jurisprudentially provided by this court in *Scott v. Hospital Serv. Dist. No. 1*, 496 So.2d 270 (La. 1986). More recently, this court summarized the standard for a JNOV in *Joseph v. Broussard Rice Mill, Inc.*, 00-0628 (La. 10/30/00), 772 So.2d 94:
>
> > As enunciated in *Scott*, [496 So.2d 270], a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact."
>
> 772 So.2d at 99 (internal citations removed). On appellate review of a JNOV, the court must first determine whether the trial judge erred in granting the JNOV by using these criteria in the same way as the trial judge in deciding whether to grant the motion. *VaSalle v. Wal–Mart Stores, Inc.*, 01-0462 (La. 11/28/01), 801 So.2d 331, 339. "That is, the **court must determine whether the 'facts and inferences point so strongly and overwhelmingly in favor of the moving party that**

**reasonable persons could not arrive at a contrary verdict**.' If reasonable persons might reach a different conclusion, then the trial judge erred in granting the motion and the jury verdict should be reinstated." *Id.*

Therefore, we will first consider whether the trial court erred in granting the JNOV as to the jury's award of $25,000 for "past and future physical and mental pain and suffering and physical impairment."

On the issue of general damages, the trial court charged the jury as follows:

> If you find that the plaintiff is entitled to an award, you may award only such as will compensate for injury and damage that you find has actually been sustained or may be sustained in the future, proven by a preponderance of the evidence. The amounts claimed by the attorney are not evidence, but merely something for you to consider.
>
> Your award should include general damages, which are:
>
> Any physical and mental pain and suffering incurred by the plaintiff in the past, present, and future[.]

The trial court's written reasons for granting the JNOV as to "past and future physical and mental pain and suffering and physical impairment," suggest that JNOV was warranted because the jury awarded the cost of the future ACDF surgery, but that the general damages awarded was too low to provide for future pain and suffering associated with recovery from that surgery. However, there was very limited testimony presented as to the specifics of the surgery, other than general testimony regarding the anticipated cost of surgery, anesthesia and hospital cost; Dr. Blanda's agreement with counsel that it was a "big surgery," without explanation as to what that meant; and that the ACDF involves "surgical removal of the offending disc or bone spur that is pressing on the spinal cord or nerves and fuse the disc." There was no testimony regarding the length of any hospital stay required by the surgery, any recovery period that Mr. Brown would face following surgery, or any degree of pain or future disability he would endure if he were to

15

undergo the surgery. Instead, Dr. Blanda was asked only about continued discomfort and pain that Mr. Brown would suffer, *if he did not have the ACDF surgery*, to which Dr. Blanda answered he "probably" would, but that "if he's going to get any better, it's going to probably take surgery to correct it."

Based on this evidence, it would be reasonable for a jury to conclude that once Mr. Brown underwent the ACDF surgery, which the jury awarded, he would no longer suffer from any neck or shoulder discomfort, and therefore an award of future pain and suffering after the surgery was not warranted. The jury also was presented with evidence indicating that Mr. Brown failed to mitigate damages as he had not yet chosen to undergo the surgery. Therefore, it would be reasonable for the jury to limit damages for "past and future physical and mental pain and suffering and physical impairment," from the date of the incident (October 13, 2013) through the date that the surgery was recommended (June 12, 2014), which is about eight months.

Moreover, the jury was presented with inconsistent testimony and evidence regarding the severity, extent, and location of Mr. Brown's reported pain and suffering during that eight-month period. Mr. Brown testified that when the incident occurred, he "didn't feel any pain hardly," but that a few days later, his neck and left shoulder started hurting, so he saw an attorney, who referred him to Dr. Abraham. Dr. Abraham's records and testimony suggest that by January 2014, Mr. Brown's cervical discomfort had "improved significantly" and that "[h]e had minimal discomfort or tenderness at all over the left cervical and upper thoracic area[.]" Dr. Abraham's February 18, 2014 record also noted that the cervical pain had significantly improved with therapy, but that on this date Mr. Brown reported "significant complaints" of left shoulder pain. Mr. Brown was therefore referred to Dr. Blanda in April 2014 due to issues with his shoulder. Dr. Blanda thereafter

16

determined that his shoulder pain could be attributed to cervical issues and therefore recommended the ACDF surgery, rather than a shoulder surgery.

At trial, however, Mr. Brown testified that after several months of treating with Dr. Abraham, his worst problem was his neck. Mr. Brown made no specific mention of shoulder pain during trial, other than stating that his shoulder bothered him a few days after the incident.

Based on the record before us, we conclude that the facts and inferences from the evidence presented do not point so strongly and overwhelmingly in favor of Mr. Brown as to the issue of damages for "past and future physical and mental pain and suffering and physical impairment." Instead, reasonable persons could reach a different conclusion as to whether he is entitled to more than the $25,000 awarded. Therefore, we find that the trial court erred in granting Mr. Brown's motion for JNOV.

CONCLUSION

For the reasons stated above, we reverse the trial court's January 31, 2017 judgment to the extent it grants Mr. Brown's motion for JNOV as to the issue of "past and future physical and mental pain and suffering and physical impairment" and increases that award to $250,000. The judgment of the trial court dated December 15, 2016, reflecting the jury's verdict is hereby reinstated. Costs of this appeal are assessed to Appellee, Willie Brown, Jr.

**REVERSED AND RENDERED.**