STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-506

SANDALON JACOBS, ET AL.

VERSUS

DAVID SAMPSON, ET AL.

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2014-1111-A
HONORABLE KERRY L. SPRUILL, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and John E. Conery,
Judges.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED WITH
INSTRUCTIONS.

Conery, J., concurs.

Michael Thomas Johnson
Johnson & Siebeneicher
Post Office Box 648
Alexandria, LA   71309
(318) 484-3911
COUNSEL FOR DEFENDANTS/APPELLEES:
      Automobile Club Inter-Insurance Exchange
      David Sampson

**James B. Reichman**
**Reichman Law Firm**
**728 Jackson Street**
**Alexandria, LA   71301-8011**
**(318) 442-3251**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **State Farm Mutual Automobile Insurance Company**

**Andrew P. Texada**
**Stafford, Stewart & Potter**
**Post Office Box 1711**
**Alexandria, LA   71309**
**(318) 487-4910**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **State Farm Mutual Automobile Insurance Company**

**Benjamin D. James**
**Roy & Scott, Attorneys at Law**
**107 North Washington Street**
**Marksville, LA   71351**
**(318) 240-7800**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Sandalon Jacobs**
    **Mario Jacobs**

**AMY, Judge.**

This matter involves an automobile accident alleged to have occurred when the driver of a truck applied the brakes in order to avoid striking a vehicle that turned into his lane of traffic. Contact with the turning vehicle was avoided. However, the driver of a vehicle being towed by the lead truck could not stop, resulting in an accident between those two vehicles. The passenger of the lead truck and the driver of the towed vehicle alleged injury as a result of the impact. Both the driver of the turning vehicle and the driver of the lead truck were named as defendants, as were their insurers. Following a bench trial, the trial court assessed 95% of the fault for the accident to the driver of the turning vehicle and 5% of the fault to the driver of the lead truck. It awarded general damages and past medical expenses to both plaintiffs. The insurer of the driver of the turning vehicle appealed. For the following reasons, we affirm in part, reverse in part, and remand with instructions.

## Factual and Procedural Background

On November 8, 2013, David Sampson was traveling on the Marksville Highway in Avoyelles Parish, with Mario Jacobs as a passenger in his Ford truck. A second truck, a Chevrolet owned and occupied by Sandalon Jacobs, was attached by tow rope. Sandalon explained that the tow was necessary in order to relocate his truck from Hessmer to his home in Marksville due to a faulty fuel pump and a lack of insurance on the vehicle.

The record indicates that as the trucks were northbound on the highway, a Buick driven by Florence Decuir was traveling on Lemoine Street toward its intersection with the highway. Ms. Decuir explained that she saw the trucks approaching and that, as she thought she saw a turn signal, she turned onto the

highway in order to give the trucks more room for the turn. Mr. Sampson, Mario, and Sandalon testified that Ms. Decuir turned onto the highway without stopping at the stop sign at the Lemoine Street intersection.[1] Mr. Sampson explained that, upon her turn, he "slowed" his truck to avoid hitting the Decuir vehicle. He denied "mashing" the brakes.

While Mr. Sampson avoided contact with Ms. Decuir, Sandalon explained that he applied the brakes in his truck in tow, but that it struck the rear of Mr. Sampson's truck. Sandalon further explained that his truck "dropped" as a result of the tire[2] flying off of the truck. Ms. Decuir, who proceeded on the highway, denied that she saw a collision, but explained that, when she looked behind her after turning, she saw a tire rolling to the side of the truck. She explained that she did not think that an accident occurred, but that she "thought maybe the tire had just blown out."

Thereafter, Mario and Sandalon filed suit, alleging personal injury as a result of the accident. They named Mr. Sampson and his insurer, Automobile Club Inter-Insurance Exchange, as defendants, as well as Ms. Decuir and her insurer, State Farm Mutual Automobile Insurance Company. State Farm was further named as a defendant in its capacity as Mario's uninsured motorist insurance provider. In pre-trial proceedings, the plaintiffs dismissed Ms. Decuir from the proceedings, but proceeded against State Farm as her insurer. By the time of the subject bench trial, the only remaining defendant was State Farm, as insurer of Ms. Decuir.

---

[1] Testimony indicated that neither a traffic signal nor stop sign controlled Mr. Sampson's lane of travel.

[2] Witnesses referenced the object as both a "tire" and a "wheel."

The trial court ultimately ruled in favor of the plaintiffs, apportioning 95% of fault to Ms. Decuir and the remaining 5% to Mr. Sampson. The trial court determined that both plaintiffs sustained soft tissue injuries. It awarded Sandalon $46,500.00 in general damages and $5,397.81 in past medical expenses. The trial court awarded Mario $35,200.00 in general damages and $7,377.73 in past medical expenses.

State Farm appeals, asserting that the trial court erred in: 1) failing to apply La.R.S. 32:866 to Sandalon's claim as he was operating his vehicle without insurance; 2) its apportionment of fault; 3) awarding Mario pharmacy bills for certain medications that had been prescribed before the accident; 4) awarding excessive general damages to Sandalon for soft tissue injuries; and in 5) awarding general damages to Mario in light of prior accidents. We address these assignments out of order for purposes of discussion.

**Discussion**

*Fault*

Challenging the 95% apportionment of fault to Ms. Decuir, State Farm asserts that the trial court erred in failing to apportion at least some fault to Sandalon as the operator of the towed truck. It argues that although Ms. Decuir executed her turn onto the highway ahead of the two trucks, the trial court erred in its failure to apportion a larger percentage fault to Mr. Sampson, as he failed to safely regulate his speed as the driver of the lead truck. It also argues that the trial court erred in failing to apportion any fault to Sandalon, as he was unable to avoid contact with Mr. Sampson's vehicle, despite the fact that he was a following vehicle being towed only one car length behind Mr. Sampson while traveling at speeds of fifty-five miles per hour.

We first address State Farm's argument that the trial court erred in its determination that Sandalon was not, to any degree, at fault for the accident. Louisiana Civil Code Article 2315 provides generally that: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Additionally, La.Civ.Code art. 2316 provides that: "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

Pursuant to the attendant duty-risk analysis, a finding of fault under the facts of a particular case requires proof that: 1) the actor had a duty to conform his or her conduct to a specific standard of care; 2) the actor failed to conform his or her conduct to that standard of care; 3) the substandard conduct was a cause-in-fact of the alleged injury; 4) the substandard conduct was a legal cause of the alleged injuries; and that 5) actual damages were sustained. *S.J. v. Lafayette Par. Sch. Bd.*, 09-2195 (La. 7/6/10), 41 So.3d 1119. For review purposes, we are mindful that a determination as to whether a duty is owed is a question of law. *Brewer v. J.B. Hunt Transport, Inc.*, 09-1408 (La. 3/16/10), 35 So.3d 230. However, a finding regarding whether a duty has been breached is a question of fact. *Id.*

With regard to State Farm's characterization of Sandalon as a following driver, La.R.S. 32:81(A) provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." Additionally, jurisprudence reflects a presumption of negligence when a following motorist is involved in a rear-end collision. *See Brewer*, 35 So.3d 230. However, that presumption is rebuttable. *Id.* The following motorist may establish that the unpredictable operation of the preceding vehicle created a situation which

4

the following motorist could not reasonably have anticipated.  *Id.* (citing *Cheairs v. State, Dep't of Transp. & Dev.*, 03-0680 (La. 12/3/03), 861 So.2d 536).

Assuming the applicability of La.R.S. 32:81(A) to Sandalon as a following driver for discussion purposes, we find no manifest error in the trial court's determination that he did not breach the duty provided by the statute.  In ruling, the trial court remarked upon Mr. Sampson's speed in driving the lead vehicle, stating:

> It is apparent that any reasonable man would not have driven this fast[3] at the location in the city limits of Marksville where the accident occurred which the, the rate of the speed apparently did not give Mr. [Sandalon] Jacobs who was being towed sufficient time to brake his vehicle and resulted as a [ ] contributing factor this accident [sic]."

Thus, the trial court considered the unique circumstance that Sandalon's vehicle was tethered to that driven by Mr. Sampson.  Certainly, it is apparent that Sandalon had only limited control over the speed of his own, towed vehicle.  Furthermore, it is apparent that the distance between the vehicles was dictated, at least in part, by the length of the tow rope.  However, we find error in the trial court's determination that the inquiry as to any duty owed by Sandalon is resolved by that consideration.

Rather, those very circumstances reveal the perilous nature of the task undertaken by both Mr. Sampson and Sandalon.  Undoubtedly, Sandalon was a participant in the towing operation that resulted in the accident.  *See, e.g.*, *LeBlanc v. Stevenson*, 00-0157 (La. 10/17/00), 770 So.2d 766 (a matter in which the plaintiff was observed to be "an actor in [an] accident" that occurred when a tow line between his stationary vehicle and a lead vehicle caused injury to his hand).  Both men agreed to undertake a towing venture that necessarily left Sandalon at

---

[3] Both Mario and Sandalon testified that they were traveling 55 miles per hour.

the steering wheel, but unable to independently control the speed of his own vehicle. He was instead subject to the speed of the lead vehicle. Neither could he control the maximum distance of his truck from Mr. Sampson's truck as that distance was dictated by the length of the tow rope the men used in the operation.

Further, it is unquestioned that Mr. Sampson's participation was at Sandalon's request. As explained above, Sandalon felt that his truck was not suitable for driving on the highway due to a faulty fuel pump and lack of insurance. Thus, and notwithstanding Mr. Sampson's fault, it is apparent that Sandalon was an actor in the towing operation and, in turn, owed a duty to act reasonably and prudently in performing that duty. *See, e.g.*, *Bates v. Lagars*, 193 So.2d 375, 379 (La.App. 2 Cir. 1966) (wherein the second circuit explained that the owner of a car being removed by a tow rope from a roadside ditch "had the right to direct and control the operation of removing his car from the ditch; he was present and actively assisting in the effort" and, thus, the acts of negligence of the tow driver were "imputable to" the owner), *writ refused*, 195 So.2d 146 (La.1967). As executed, however, the joint undertaking resulted in Sandalon being unable to timely stop his vehicle or independently fulfill the duty required of a following vehicle.[4] *See* La.R.S. 32:81(A). In this regard, we find that the trial court was manifestly erroneous in failing to determine that Sandalon, too, breached a duty owed by him. Given the immediacy of the accident and Sandalon's allegations regarding the causation of his injuries, the presence of the legal cause and cause-in-fact elements of the duty-risk analysis are readily apparent.

---

[4] We note that State Farm also contends that Sandalon should have been assessed with fault due to his tire flying from the car. Although State Farm suggests that this event could have "contributed to his inability to stop in time," a breach of duty is not apparent from the fact of this allegation alone. Significantly, State Farm presented no witness, lay or expert, who testified regarding the tire as a causative factor.

Finally, and as explained above, we are mindful that the driver of a following vehicle may rebut a presumption of negligence in a rear-end accident by demonstrating that the unpredictable operation of the preceding vehicle created a situation which the following motorist could not have anticipated. *Brewer*, 35 So.3d 230. However, in this instance, it is clear that Sandalon could have anticipated that the lead vehicle would travel at speeds beyond which he could safely stop given the distance dictated by the tow rope and his limited operational control of the vehicle.[5] Thus, the record demonstrates that Sandalon failed to rebut the presumption.

The finding that the trial court was manifestly erroneous in failing to assign any fault to Sandalon requires adjustment of the allocation of fault. *See, e.g., Brewer*, 35 So.3d 230. Additionally, State Farm questions the trial court's apportionment of the greater percentage of fault (95%) to its insured, Ms. Decuir, in comparison to the minimal percentage (5%) attributed to Mr. Sampson. In particular, State Farm suggests that "the primary cause of the accident was the decision to tow the Jacobs truck at 55 mph, for which David Sampson and Sandalon Jacobs are equally at fault." It suggests that Ms. Decuir's fault, if any, was minimal and asserts that "[s]he may have mistaken the emergency flashers for a right turn signal, but [ ] when she pulled out onto the highway, there was still sufficient time and space for the Sampson truck to avoid hitting her without taking extraordinary measures other than to apply his brakes."

Louisiana Civil Code Article 2323(A) provides for comparative fault and requires that:

---

[5] Sandalon explained at trial that his engine was not turned on while the truck was being towed. When asked by State Farm's counsel whether "any of the power brakes worked[,]" Sandalon explained that: "All know is I had steering and I had braking you know that's all."

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

The supreme court has explained that allocation of fault is evaluated under the following factors:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior, and, (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.

*Thompson v. Winn-Dixie Montgomery, Inc.*, 15-0477, p. 14 (La. 10/14/15), 181 So.3d 656, 666-67 (citing *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967 (La.1985)). As a trial court's "findings regarding percentages of fault are factual," those findings "will not be disturbed on appeal unless clearly wrong." *Purvis v. Grant Par. Sch. Bd.*, 13-1424, p. 4 (La. 2/14/14), 144 So.3d 922, 926. However, after an appellate court finds clear error in the apportionment of fault, "it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trier of fact's discretion." *Brewer*, 35 So.3d at 244.

Having reviewed the record in light of the factors of apportionment above, we conclude that the trial court was clearly wrong both in its failure to apportion fault to Sandalon and in its apportionment of 95% of the fault to Ms. Decuir. However, the record does support the trial court's finding of fault on the part of

8

Ms. Decuir. In ruling, the trial court determined that, although Ms. Decuir felt that Mr. Sampson's vehicle was turning upon seeking a blinking light, "it was the flasher's [sic] that Mr. Sampson had turned on as he had indicated in his deposition and is support[ed] by the testimony of both plaintiffs today." The trial court noted testimony indicating that all four of Mr. Sampson's hazard lights were working and additionally noted testimony that the trucks were proceeding straight ahead without intention of turning. The trial court further found that Ms. Decuir "didn't yield at that stop sign and without determining that this right turn could be made safely." Thus, the trial court determined that she "was careless in her [ ] operation of her vehicle at that time." That maneuver, the trial court found, "caused David Sampson to brake the towing vehicle that he was driving." As addressed above, it further "set out a series of events that require[d] Mr. [Sandalon] Jacobs to have to stop the vehicle[.]" Again, the trial court rejected a finding of fault by Sandalon, finding that "the lead or turning vehicle in this case driven by Ms. Decuir . . . created a hazardous situation which the following vehicle that is coming along and it had pre-empted the right of way . . . the Sampson vehicle and his vehicle in tow could not avoid." In particular, the trial court found that "the acts of negligence for Ms. Decuir" included disregarding the stop sign and failing to yield the right of way. *See* La.R.S. 32:123.[6] The trial court then addressed Mr. Sampson's fault,

---

[6] Louisiana Revised Statutes 32:123 provides, in pertinent part:

> A. Preferential right of way at an intersection may be indicated by stop signs or yield signs.

> B. Except when directed to proceed by a police officer or traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the crosswalk on the near side at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right-of-way to all vehicles which have entered the intersection from

determining, as previously set forth, that he was traveling at an excessive rate of speed for the area.

While State Farm suggests in its brief that Ms. Decuir "testified that she came to a complete stop at the stop sign and saw the Sampson vehicle" before proceeding onto the highway, review of Ms. Decuir's deposition testimony does not support that assertion.[7] Rather, Ms. Decuir did not testify as to whether or not she stopped at the stop sign and, furthermore, testified that she saw the "vehicles coming." In any event, however, the trial court credited the version of events offered by Mr. Sampson, Mario, and Sandalon, who each explained that they saw Ms. Decuir approach the intersection, but that she failed to stop. Their testimony further supported the finding that Mr. Sampson's "flashers," rather than his turn signal, were engaged. As these assessments of credibility were within the trial court's province and are owed great deference, we leave those findings undisturbed and maintain the determination that Ms. Decuir was at fault in the accident. *See Hebert v. Rapides Par. Police Jury*, 06-2001 (La. 4/11/07), 974 So.2d 635.

Yet, having addressed Ms. Decuir's fault, the record does not support a finding that she was responsible for the majority of fault as found by the trial court. Certainly, Ms. Decuir's actions created a significant risk and, in this case, resulted in an accident. *See Thompson*, 181 So.3d 656. And, despite Mr. Sampson's apparent speed, Ms. Decuir was the only driver faced with a control signal at that intersection. She was, at least arguably, in a superior position to prevent the

---

another highway or which are approaching so closely on said highway as to constitute an immediate hazard.

[7] Describing the events at issue, Ms. Decuir stated that: "I left my house, went to the corner of the highway and Lemoine. Saw these vehicles coming. Saw a left turn signal, so I proceeded to turn right to give them more room. And I went on down toward CVS. I did not touch anything." She further related that she then "saw this vehicle coming behind me. That is when I looked to the back, and I did see a tire. But other than that, I didn't see anything else."

accident, which we address below. *Id.* Further, the trial court determined that Ms. Decuir created a significant risk by turning into a lane of travel without ensuring that the vehicles, one of which was being towed, were turning as she mistakenly expected. *Id.* Neither does the record indicate that there were extenuating circumstances that would have required Ms. Decuir to proceed in haste without proper thought. *Id.* While Ms. Decuir explained that she was providing the turning vehicles with additional room, there was no testimony that additional room would have been required in the event of such a turn. Finally, however, it appears that Ms. Decuir's actions resulted from inadvertence as her turn was apparently predicated upon her failure to recognize that Mr. Sampson's hazard lights were engaged rather than his turn signal. *Id.*

Contrarily, Mr. Sampson and Sandalon intentionally undertook the towing operation, subjecting the towed vehicle, with Sandalon at the wheel, to the highway speeds driven by the lead vehicle. *See Thompson*, 181 So.3d 656. Like the actions of Ms. Decuir, the towing of a vehicle at speeds beyond which the towed vehicle could possibly stop obviously created a significant risk. The third comparative fault inquiry of "the significance of what was sought by the conduct" of the actor does not fall in favor of Mr. Sampson and Sandalon. *Id.* at 667. While Sandalon's truck may have required a tow to his home in Marksville, a towing service could have been engaged for the transfer. The pair instead employed this self-help measure. Further, the record contains no extenuating circumstances that required their actions. *Id.* As the various factors are largely applicable to some extent to all of the actors, it is the remaining element regarding the respective capacities of the actors that is determinative in this case. *Id.*

11

Above, we observed that Ms. Decuir was arguably in a superior position to avoid the accident as she turned onto a highway without yielding and doing so with the two vehicles approaching at a high rate of speed. Despite her negligence in doing so, however, recall that Mr. Sampson was, in fact, able to stop his vehicle without striking her. Thus, while Ms. Decuir's action of turning ahead of the vehicles was a contributing factor, the injuries here would not have occurred absent the conditions surrounding the towed vehicle. In short, had Mr. Sampson not been towing Sandalon in his vehicle and doing so at such a high rate of speed, there would have been no accident between the lead and towed trucks. Thus, we conclude that the record dictates that Mr. Sampson and Sandalon must bear the greater percentage of fault. Accordingly, we increase the fault attributable to Mr. Sampson to 30% and further apportion a corresponding 30% of the fault to Sandalon, amounts that we find are the lowest amount the trial court could have reasonably allocated to them. *Brewer*, 35 So.3d 230. In turn, we decrease Ms. Decuir's apportionment of fault to the remaining 40%, the highest point that was reasonably within the trial court's discretion. *Id.*

Finding merit in this argument, we below include language in the decree reflecting the apportionment of fault between the three drivers. We further remand this matter to the trial court to amend the award of damages in light of that apportionment.

*Damages*

State Farm also challenges the trial court's damages award, suggesting that the measure of general damages found due to both Sandalon ($46,500.00) and to Mario ($35,200.00) is excessive. State Farm separately contests the award of

certain prescription drugs to Mario as he was previously prescribed those medications for pre-existing injuries.

With regard to review of damages, La.Civ.Code art. 2324.1 provides that: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Additionally, a trial court's determination of the appropriate quantum of damages is also entitled to great deference by an appellate court. *Guillory v. Lee*, 09-0075 (La. 6/26/09), 16 So.3d 1104. Because that discretion "is so great, and even vast, an appellate court should rarely disturb an award on review." *Id.* at 1117.

As for general damages, which the supreme court observed may not be fixed with "pecuniary exactitude," an appellate court is not to decide what it considers to be an appropriate award. *Guillory*, 16 So.3d at 1117. Rather, the appellate court reviews the trial court's exercise of its discretion. *Id.* Further, in review of a trier of fact's award of special damages such as medical expenses, which "theoretically may be determined with relative certainty," an appellate court considers: 1) whether a reasonable basis exists for a trial court's conclusions and 2) whether that finding was clearly wrong. *Id.* at 1117. With this standard in mind, we consider State Farm's assignments regarding damages.

General Damages – Sandalon Jacobs

Noting that Sandalon testified that he suffered neck and back injury as a result of the accident, State Farm asserts that he otherwise offered "very little testimony regarding the severity of his pain or injury." It further notes that he was able to continue in his position as a grass cutter for Avoyelles Parish. This evidence, State Farm argues, does not support the $46,500.00 general damages award. It instead argues that the trial court's reasons for ruling indicate an

13

excessive reliance on the number of months that Sandalon received treatment rather than evidence of his limitations.

On review, we do not disturb the trial court's ruling. Sandalon explained at trial that he sustained injury to his low back and neck and that he began treatment with Dr. Darron McCann eleven days following the accident. Sandalon confirmed that he saw Dr. McCann a total of sixteen times over the course of approximately eighteen months. Reference to exhibits introduced regarding Dr. McCann's care reveals a diagnosis of neck strain, back strain and insomnia related to that discomfort. Dr. McCann indicated in his narrative report that Sandalon's treatment included: "cortisone injections, pain medications, muscle relaxers, anti-inflammatory medication, and sleep medication."

The records also indicate that Sandalon was prescribed physical therapy, which he completed after seven visits. Although Sandalon testified that the physical therapy exacerbated his pain, Dr. McCann reported that it "did help some." Noting that Sandalon's symptoms diminished over the course of the treatment, Dr. McCann reported that Sandalon's medication was adjusted accordingly. Dr. McCann's narrative report indicates that Sandalon's neck complaints resolved by July 2014 and that his back complaints resolved by March 2015. Sandalon's testimony confirmed the improvement in his pain. By the time of the March 2016 trial, he explained that he occasionally has aches and pains in his lower back and a burning sensation in his neck, but that he "[j]ust deal[s] with it."

In light of this evidence, we find no abuse of discretion in the trial court's award to Sandalon. While Sandalon spoke only generally regarding the pain he experienced and his ability to continue his physically demanding job, the

documentary evidence of his medical care corroborates his complaints, providing further support for the quantum of the award. Dr. McCann employed a multi-faceted approach to the soft tissue injuries relying not only upon various medications, but cortisone injections and physical therapy as well.

Finally, we find no merit in State Farm's assertion that the trial court placed undue reliance on the number of months for which Sandalon received treatment. First, we note that an appellate court reviews a trial court's judgment, not its reasons for ruling. *Wooley v. Lucksinger*, 09-571 (La. 4/1/11), 61 So.3d 507. Rather, a trial court's oral or written ruling is a mere explanation of a trial court's determinations. *Id.* Furthermore, State Farm cites no jurisprudence indicating that the length of Sandalon's treatment may not be considered as a factor in shaping the damages award.

This assignment lacks merit.

General Damages – Mario Jacobs

In its assignments regarding the trial court's award of damages to Mario, State Farm observes that Mario had a work-related back condition prior to the subject accident, had undergone two back surgeries, and was an ongoing pain management patient of Dr. Michael Dole. With regard to general damages, State Farm suggests that Mario did not inform Dr. Dole of the subject car accident, which "establishes that [he] did not have any significant pain because of this accident." It argues that, at most, the trial court should have compensated Mario for a six-month increase in pain. It suggests that jurisprudence indicates that the highest reasonable award would be approximately $18,000.00 rather than the $32,500.00 awarded by the trial court.

We find no merit in State Farm's argument as to the award of general damages. Undoubtedly, the record establishes that Mario was a pre-existing pain patient.[8] Dr. Dole testified that when he began treating Mario in April 2012, his impression of Mario's condition was low back pain with radiculopathy. He explained that he felt that Mario suffered from chronic pain syndrome with opioid dependence. He prescribed narcotics for management of the associated pain.

After the present accident, however, Mario began treatment with Dr. Dixie Clement, upon referral from Mario's attorney. Dr. Clement, qualified as an expert in family practice, explained that she first treated Mario on November 30, 2013 and that he reported neck pain, left leg pain, upper, mid and low back pain. She noted that he was in mild distress and that he had an abnormal gait. Dr. Clement testified that she identified spasm in both the neck and back, as well as "tenderness palpation mid-line in his lower lumbar and his bi-lateral sacral iliac joints." Dr. Clement confirmed that Mario reported his earlier surgeries to her as well as Dr. Dole's involvement. Dr. Clement explained that she felt that Mario had suffered an aggravation or exacerbation of the pre-existing injuries. Additionally, because of Dr. Dole's involvement, she explained that she felt that her role was to treat injuries from the subject accident, whereas Dr. Dole treated Mario for the chronic pre-existing low back pain. Dr. Clement explained that her office immediately notified Dr. Dole's office, via fax, of her treatment of Mario and that he was thereafter kept apprized. During the course of her treatment, through September 2015, Dr. Clement continued to note objective findings, including spasm and decreased range of motion. She treated Mario's complaints, in part, with cortisone

---

[8] Mario explained that before the accident, he "had two open back surgeries with the rod and screws." After the subject accident, he underwent two additional surgeries for the placement of stimulators.

injections. She maintained her diagnosis of a "neck pain/whiplash injury" and "mid-back pain as well or thoracic pain." She related those injuries to the subject accident.

Mario also testified as to an aggravation of his pre-existing injuries for which he was seeking treatment from Dr. Dole. He explained that, before the accident, his condition had been improving. However, since the accident, he explained that he "feel[s] it now" and that he "felt it then too after that impact." He further testified that the neck and shoulder injuries were new.

Acknowledging the continuation of pain management treatment by Dr. Dole, Mario explained that he felt that Dr. Dole and Dr. Clement worked together. He stated that: "She treated me with [sic] for my neck and Dr. Dole continued with the back and she gave Cortisone shot[s] when I needed it." Mario explained that, at the time of trial, he was "still dealing" with the pain in his neck and shoulders. He described the pain as "a burning, burning sensation." When asked whether it was similar to the pre-existing back pain, Mario stated that it "is a hurting pain but it burns." He noted that the pain is more intense at night and that it disturbs his sleep. Mario confirmed that the injury to his neck and shoulder, as well as the aggravation of his back injury had disrupted his daily life.

In ruling, the trial court noted Dr. Clement's attempted coordination of care with Dr. Dole and recognized that she testified regarding her treatment of areas "relevant to this accident," including an exacerbation of prior lower back and leg pain. The trial court further pointed to Dr. Dole's deposition wherein he explained that he did not have any reports from Mario regarding neck complaints that pre-existed the November 2013 accident as corroboration of Mario's assertion that the neck and shoulder pain began at that time. The trial court determined that, in all,

17

Mario treated with Dr. Clement for twenty-two months in fashioning its award of $35,200.00.

After review, we find no abuse of discretion in the trial court's award in that regard. Rather, Mario plainly explained the difference in his injuries before and after this accident. In addition to the aggravation of back symptoms that he described, he further began treatment for a new onset of both neck and shoulder pain. Dr. Clement identified objective signs of associated injury and provided repeated injections for those conditions. Despite those treatments, and despite the almost two years of treatment recognized by the trial court, Mario explained at trial that he continued to have pain from the accident-related injuries. We find that these circumstances, credited by the trial court, provide a reasonable basis for the trial court's award.

This assignment lacks merit.

Medical Expenses – Mario Jacobs

Again noting Dr. Dole's prior treatment of Mario, State Farm also challenges the trial court's award of $4,170.73 for pharmacy bills. State Farm notes that Dr. Dole had prescribed both oxycodone and Percocet before the November 2013 accident. Due to this pre-existing need, State Farm asserts that Mario did not establish that "the pharmacy bills would not have been incurred 'but for' the accident of November 8, 2013." It argues that, "[t]o the contrary, Dr. Dole's testimony undisputedly shows the pharmacy bills would have been incurred regardless of whether or not plaintiff was involved in the accident with Ms. Decuir."

After review, we find a reasonable basis for the trial court's award of those prescription charges. Simply, as referenced above, the trial court credited Dr.

Clement's explanation that she coordinated her care with that offered by Dr. Dole. As the latter physician had an ongoing relationship with Mario for pain management and that pain medications were administered through him, Dr. Clement explained that she did not separately address the need for pain medication. However, her testimony was clear that the subject accident aggravated/exacerbated the underlying injuries and, additionally, produced separate injuries for which she provided treatment. While State Farm suggests that Mario's pharmacy needs would have remained the same without the new injuries, there is no testimony to that regard. As such, State Farm's argument is conclusory and assumes facts not in evidence. Rather, the record reflects that he had pre-existing injuries, he suffered an aggravation of those injuries as well as new injuries which Dr. Clement attributed to this accident, and that he incurred medication costs at that time. Notably, Dr. Dole explained that his records indicated that Mario had not complained of neck pain before the subject accident, but that he did complain of neck pain during his December 2013 visit. Given this factual basis, we find no clear error in the trial court's assessment of special damages for Mario's prescription costs.

This assignment of error lacks merit.

*Uninsured Motorist*

As a final matter, we address State Farm's assertion that the trial court erred in failing to reduce Sandalon's recovery by operation of La.R.S. 32:866 as he acknowledged that he did not carry liability insurance on his truck involved in the accident. The trial court denied State Farm's request in this regard, first finding that the truck "was not a functioning vehicle at the time that this [] happened." It further explained that: "The ignition key was turned on but that was I think to

make the steering and the brakes operate. It was being [sic] it did have a driver, Plaintiff, Sandalon Jacobs." In turn, the trial court referenced jurisprudence determining the inapplicability of La.R.S. 32:866 to parked vehicles and found the present matter analogous. *See, e.g., Rogers v. Commercial Union Ins. Co.*, 01-443 (La.App. 3 Cir. 10/3/01), 796 So.2d 862; *Gibbs v. State Farm Mut. Auto. Ins. Co.*, 99-1242 (La.App. 4 Cir. 10/13/99), 746 So.2d 685, *writ denied*, 99-3234 (La. 1/14/00), 753 So.2d 220. The trial court explained that La.R.S. 32:866 "was not intended to deprive the owners of vehicles who were [sic] that are not operational of the right to recover damages especially under these limited facts and circumstances." On review, however, we find error in the trial court's interpretation in this regard.

Louisiana Revised Statutes 32:866 provides, in pertinent part:

> A. (1) There shall be no recovery for the first fifteen thousand dollars of bodily injury and no recovery for the first twenty-five thousand dollars of property damage based on any cause or right of action arising out of a motor vehicle accident, *for such injury or damages occasioned by an owner or operator of a motor vehicle involved in such accident who fails to own or maintain compulsory motor vehicle liability security*.

(Emphasis added.) By its wording, La.R.S. 32:866 references damages "occasioned"[9] by an "owner *or* operator of a motor vehicle involved in such accident." (Emphasis added.) Louisiana Revised Statutes 32:851 defines these separate terms as:

> (8) "Operator" means every person who is in actual physical control of a motor vehicle.

---

[9] The supreme court has explained that La.R.S. 32:866's use of "occasioned by" means "suffered by" rather than "caused by[.]" *See Progressive Sec. Ins. Co. v. Foster*, 97-2985, p. 16 (La. 4/23/98), 711 So.2d 675, 685.

(9) "Owner" means every person who holds the legal title to a motor vehicle or in the event a motor vehicle is the subject of an agreement for the conditional sale, lease, or transfer of the possession, however, thereof, with the right of purchase upon performance of the condition stated in the agreement and with an immediate right of possession vested in the conditional vendee, lessee, possessor, or in the event such or similar transaction is had by means of a mortgage, and the mortgagor of a vehicle is entitled to possession, then such conditional vendee, lessee, possessor, or mortgagor shall be deemed the owner for the purpose of this Chapter.

We first note that La.R.S. 32:866 applies to "an owner *or* operator of a motor vehicle[.]" (Emphasis added.) The record indicates that Sandalon "owned" the truck that he was occupying as he testified that he held the title. *See* La.R.S. 32:851(9). Thus, applying the clear and unambiguous wording of the statute, the limitation of recovery provisions of La.R.S. 32:866(A)(1) are applicable in this case. *See* La.R.S. 1:4 ("When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit."). *See also* La.Civ.Code art. 9 ("When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.").

Further, Sandalon's testimony suggests that he was also the "operator" of the truck as, at least to some extent, he exercised "actual physical control" of the vehicle. *See* La.R.S. 32:851(9). Despite the fact that it was attached by tow rope to Mr. Sampson's vehicle and the engine was not engaged, Sandalon explained that he had turned "the key on" "[t]o get brakes." He further testified that throughout the trip, he applied the brakes to slow the vehicle and that he was able to stop at stop signs along the way. Although he applied his brakes, he was not, of course, able to avoid the accident at issue.

21

Additionally, Sandalon's control of the vehicle must be viewed differently from those cases involving parked vehicles where the courts have found that the legislative intent of La.R.S. 32:866 would not be carried out by its application to the particular circumstances before them. *See Rogers*, 796 So.2d 862 (wherein a panel of this court considered a case in which an uninsured, but unoccupied vehicle was hit by another car while parked inside of a private parking lot); *Gibbs*, 746 So.2d 685 (a writ ruling wherein the fourth circuit maintained a trial court's refusal to apply La.R.S. 32:866 to limit an uninsured owner's claim for damage sustained to an unoccupied, parked vehicle). Obviously, both unoccupied vehicle cases involved only property damages, not bodily injury.

Furthermore, neither *Rogers* nor *Gibbs* involved factual situations in which the owner was also an "operator," at least to some extent, as they were both unoccupied. In *Rogers*, 796 So.2d at 865, the panel reasoned that the purpose of La.R.S. 32:866 is "to discourage the *operation* of uninsured vehicles" and, therefore, the application of the statute "to parked vehicles would not accomplish the purpose. Likewise, the statute is not intended to deprive owners of parked vehicles of the right to recover property damage." (Emphasis added.)[10]

The present case is not analogous. Rather, Sandalon was an owner, and he exercised at least some actual control over the vehicle so as to be viewed as its operator in some limited sense. Additionally, Sandalon does not present a claim for property damages sustained by an unoccupied vehicle. Rather, he seeks damages for bodily injury sustained while occupying the vehicle.

---

[10] Additionally, subsequent to the accidents at issue in both *Rogers* and *Gibbs*, La.R.S. 32:866(H) was amended and presently provides that: "The provisions of this Part shall not apply to any vehicle which is legally parked at the time of the accident."

Given the facts of this case and the clear and unambiguous wording of La.R.S. 32:866, we find that the trial court erred in its determination that La.R.S. 32:866 was inapplicable to the present case. Accordingly, we reverse that aspect of the trial court's ruling and, on remand, instruct the trial court to amend the judgment to reflect Sandalon's inability to recover "for the first fifteen thousand dollars of bodily injury" per La.R.S. 32:866(A)(1).

## DECREE

For the foregoing reasons, the judgment is affirmed to the extent it found fault on the part of Florence Decuir and David Sampson. Although the judgment is further affirmed as to the measure of damages incurred by Sandalon Jacobs and Mario Jacobs, the judgment is reversed to the extent it cast Ms. Decuir and State Farm Mutual Automobile Insurance Company in judgment for sums previously reduced by the erroneous allocation of fault.

Judgment is hereby rendered, allocating fault for causing the accident of November 8, 2013 as follows: Florence Decuir (40%); David Sampson (30%); and Sandalon Jacobs (30%). This matter is remanded to the trial court with instructions to reform the judgment to cast Florence Decuir and State Farm in judgment for sums reflecting the amended apportionment of fault and the application of La.R.S. 32:866(A)(1) to limit Sandalon Jacob's recovery "for the first fifteen thousand dollars of bodily injury[.]" Costs of this proceeding are assessed equally to plaintiff-appellee Sandalon Jacobs and defendant-appellant State Farm Mutual Automobile Insurance Company.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.**