# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-712

**SCOTT WESLEY EASTMAN, ET UX**

**VERSUS**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ET AL**

************
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT
PARISH OF CALCASIEU, DOCKET NO. 16-4474
HONORABLE ROBERT WYATT, DISTRICT JUDGE
************
## LEDRICKA J. THIERRY
## JUDGE
************

Court composed of D. Kent Savoie, Van H. Kyzar, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

Barry A. Roach
Michael H. Schwartzberg
Larry A. Roach, Inc.
2917 Ryan Street
Lake Charles, LA 70601
(337) 433-8504
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Scott Wesley Eastman and Darnell Eastman


Allen J. Mitchell, II
Mitchell & Blanco, LLC
1607 Ryan Street
Lake Charles, LA 70601
(337) 436-8686
COUNSEL FOR DEFENDANTS/APPELLANTS:
    State Farm Mutual Auto Insurance Company
    and Jillian Peterson

**THIERRY, Judge.**

Defendant insurer and driver appeal the trial court's judgment which granted plaintiffs' judgment notwithstanding the verdict ("JNOV"), altered the jury's findings on liability, and increased the awards for past and future medical expenses, future general damages, and loss of future earning capacity. For the reasons that follow, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

This matter arises out of a three-vehicle crash that occurred on November 19, 2015, in Calcasieu Parish on Interstate 10. The crash involved Roger Burns, the driver of the first vehicle, Scott Eastman, the plaintiff and driver of the middle vehicle, and Jillian Peterson, the defendant and driver of the third vehicle. At the time of the crash, traffic was congested and slow-moving in a "stop and go" fashion. Ms. Peterson, in an attempt to avoid the heavy traffic that was building up in the right lane, took her eyes off the vehicles in front of her to try and change lanes. She could not successfully change lanes, and when she returned her attention to the vehicles in front of her in the right lane, she was about one car length behind Mr. Eastman's vehicle. Unable to stop in time, she rear-ended Mr. Eastman.

There is no dispute that Ms. Peterson rear-ended Mr. Eastman, which then caused Mr. Eastman to rear-end Mr. Burns. However, it is disputed whether Mr. Eastman separately rear-ended Mr. Burns prior to being rear-ended by Ms. Peterson. Mr. Burns testified that he was rear-ended twice: first by Mr. Eastman alone, and second after Ms. Peterson rear-ended Mr. Eastman, causing Mr. Eastman's vehicle to strike his car a second time. Mr. Eastman denies rear-ending Mr. Burns before being struck by Ms. Peterson.

After the crash, Mr. Eastman was taken by ambulance to a local hospital, complaining of neck, head, and back pain. He treated with many different medical providers following the crash, including Dr. Shaine Rider, a chiropractor; Dr. Clark Gunderson, an orthopedic specialist; Dr. Howard Cotler, who recommended neck surgery; Dr. Craig Morton, who performed several cervical injections on Mr. Eastman; Dr. Brian Kelly, a neurosurgeon who also recommended surgery; Dr. Rex Marco, a specialist in Houston; and Dr. William Crookshank, a pain management specialist. Mr. Eastman also treated with his chiropractor, Dr. Rider, prior to the car accident for neck pain related to a pre-existing condition called diffuse idiopathic skeletal hyperostosis ("DISH").

Mr. Eastman and his wife, Mrs. Darnell Eastman, filed suit for their damages against Ms. Peterson and her insurer, State Farm Mutual Automobile Insurance Company. Trial commenced on June 28, 2021. The jury found Ms. Peterson and Mr. Eastman each fifty percent at fault for Mr. Eastman's injuries. The jury awarded a verdict for past and present medical expenses ($19,732.14), past and present loss of enjoyment of life ($16,000.00), past and present pain and suffering ($50,000.00), past and present mental anguish ($5,000.00), and loss of consortium to Mrs. Darnell Eastman ($20,000.00). The jury awarded zero dollars for all future awards, including future medical expenses, future mental anguish, future disability, future loss of enjoyment of life, future pain and suffering, and future loss of earnings and earning capacity.

Plaintiffs filed a JNOV on both liability and damages and alternatively, a motion for new trial. The hearing on that matter was held on January 18, 2022. The trial judge granted the JNOV and denied the motion for new trial with written reasons dated April 28, 2022. The judgment was signed and filed on June 7, 2022.

In its reasons, the trial court held that "the findings by the jury were clearly erroneous and factually and legal unsupported in several of their determinations." The court found Ms. Peterson to be one hundred percent at fault and awarded Mr. Eastman $138,419.06 for past medical expenses, $625,875.00 for future medical expenses, $150,000.00 for future loss of enjoyment of life, future pain and suffering, and future mental anguish, and $130,000.00 for future loss of earnings and earning capacity.

It is this granting of the JNOV and judgment dated June 7, 2022, that defendants now appeal, assigning that the trial court committed errors by granting the JNOV on the issues of: (1) liability; (2) past and future medical expenses; (3) future loss of enjoyment of life, future pain and suffering, and future mental anguish; and (4) loss of future earning capacity.

## STANDARD OF REVIEW

Louisiana Code of Civil Procedure Article 1811 sets forth the procedural mechanism of a JNOV, which permits a trial court to modify a jury's findings "to correct an erroneous jury verdict." *Pitts v. La. Med. Mut. Ins. Co.*, 16-1232, p. 7 (La. 3/15/17), 218 So.3d 58, 64; *see also Brown v. Breaux Bridge Ventures, LLC*, 17-440 (La.App. 3 Cir. 2/15/18), 239 So.3d 319, *writ denied*, 18-444 (La. 5/11/18), 242 So.3d 568. In evaluating a motion for JNOV, "the trial court considers whether the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not arrive at a contrary verdict." *Guillory v. Saucier*, 11-745, p. 11 (La.App. 3 Cir. 12/7/11), 79 So.3d 1188, 1196, *writs denied*, 12-75, 12-81 (La. 3/9/12), 84 So.3d 554, 555; *see also Joseph v. Broussard Rice Mill, Inc.*, 00-628 (La. 10/30/00), 772 So.2d 94. A mere preponderance of the evidence for the mover does not justify the granting of a JNOV. *Anderson v. New Orleans P Serv., Inc.*, 583 So.2d 829 (La. 1991). The trial court may not evaluate the credibility of

3

the witnesses, and "it must resolve all reasonable inferences or factual questions in favor of the non-moving party." *Guillory*, 79 So.3d at 1196-97.

If a trial court concludes that a JNOV is warranted, the trial court becomes the "trier of fact" and conducts a de novo review. *Anderson*, 583 So.2d at 834. As the Louisiana supreme court in *Anderson* explained:

> The trial judge is in a better position to make a damage assessment than is an appellate court. The trial judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a damage award. The trial judge should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case.

*Id.*

The standard of review on appeal for a JNOV is a two-step inquiry. The first step requires the appellate court to "determine whether the district judge erred in granting the JNOV by using the above-mentioned criteria in the same way as the district judge in deciding whether to grant the motion." *Trunk v. Med. Ctr. of La. at New Orleans*, 04-181, p. 5 (La. 10/19/04), 885 So.2d 534, 537. In other words, the appellate court must determine whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not arrive at a contrary verdict." *Guillory*, 79 So.3d at 1196. "If the appellate court determines that reasonable persons might reach a different conclusion, then the district judge erred in granting the motion and the jury verdict should be reinstated." *Trunk*, 885 So.2d at 537. If, however, the facts and inferences weigh so overwhelmingly in favor of the moving party, such that reasonable men could not arrive at a contrary verdict, "then the trial judge was correct in granting the motion." *Anderson*, 583 So.2d at 832; *see also Brown v. State ex rel. Dep't Transp. & Dev.*, 15-23 (La.App. 3 Cir.

4

5/27/15), 166 So.3d 1197, *writ denied sub nom. Brown v. State Farm Mut. Auto Ins. Co.*, 15-1474 (La. 10/23/15), 179 So.3d 601.

If the appellate court finds that the trial court correctly granted the JNOV, the second step requires the appellate court to review the trial court's subsequent judgment using the manifest error standard of review. *Davis v. Wal-Mart Stores, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84. Under the manifest error of review, "the issue before the court of appeal is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one." *Snider v. La. Med. Mut. Ins. Co.*, 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323. The appellate court may not reweigh the evidence or disturb the factual findings of the fact-finder simply because it would have ruled differently. *Id.*

## ANALYSIS

**Liability**

In their first assignment of error, defendants allege that the trial court erred by granting the JNOV on the issue of liability. At trial, the jury allocated fifty percent fault to defendant, Ms. Peterson, and fifty percent fault to plaintiff, Mr. Eastman. The trial court altered this allocation in the granting of the JNOV, holding that Mr. Eastman was free from fault and Ms. Peterson was one hundred percent at fault for the accident.

The two-part inquiry on appeal requires that we first consider whether the facts and inferences weigh so overwhelmingly in favor of the moving party, such that reasonable men could not arrive at a contrary verdict. Our careful review of the evidence and applicable law supports the trial court's granting of the JNOV on this issue.

Pursuant to La.R.S. 32:81(A), "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." When a rear end collision occurs, the following car is presumed to be negligent. *Jacobs v. Sampson*, 16-506 (La.App. 3 Cir. 11/9/16), 206 So.3d 1191, *writ denied*, 16-2201 (La. 1/23/17), 215 So.3d 683. However, this presumption can be rebutted when the following motorist demonstrates "that he or she had his car under control, closely observed the preceding vehicle, and followed at a safe distance under the circumstances[.]" *Garcia v. Stalsby*, 11-350, p. 5 (La.App. 3 Cir. 12/14/11), 78 So.3d 873, 877, *writ denied*, 12-422 (La. 4/9/12), 85 So.3d 703; *see also Stelly v. Nat'l Union Fire Ins. Co.*, 18-293 (La.App. 3 Cir. 2/6/19), 266 So.3d 395.

Alternatively, a following motorist may avoid the presumption by invoking the sudden emergency doctrine "by *proving that the driver of the lead car negligently created a hazard which the following motorist could not reasonably avoid.*" *Garcia*, 78 So.3d at 877 (emphasis in original). This doctrine was set forth by the supreme court in *Hickman v. Southern Pacific Transport Co.*, 262 La. 102, 113-14, 262 So.2d 385, 389 (1972), which held:

> One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.

Importantly, though, "[t]he sudden emergency doctrine cannot be used by one who fails to use due care in avoiding the emergency and does not lower the standard of care required of motorists before the emergency occurs." *Leblanc v. Bouzon*, 14-1041, p. 3 (La.App. 3 Cir. 3/4/15), 159 So.3d 1144, 1146-47.

6

A recent case from the Louisiana fifth circuit, *Mandible v. Jan Raley & Allstate Insurance Co.*, 13-461 (La.App. 5 Cir. 12/12/13), 131 So.3d 247, is particularly relevant to the facts of this case. That case involved a multi-vehicle accident in which there was conflicting testimony regarding whether the plaintiff first rear-ended the car in front of her prior to being rear-ended by defendant. The appellate court noted that whether the plaintiff hit the car in front of her prior to being rear-ended did not rebut defendant's presumption of fault:

> The collision was not simultaneous, and no evidence exists to support a finding that plaintiff's negligence, if any, in following [the first vehicle] too closely, was the proximate cause of defendant's collision, and does not absolve defendant of liability from failing to perform her duty to follow plaintiff at a safe distance.

*Id.* at 250. The court ultimately affirmed the trial court's finding that defendant was one hundred percent at fault for the collision.

Ms. Peterson, who was seventeen years old at the time of the crash, testified that right before the crash, she looked to her left to try to switch from the right lane to the left lane. She wanted to switch lanes because the traffic in the right lane was slowing down. She admitted she was distracted in that moment, as the switching of the lanes caused her to take her eyes off the vehicles in front of her. When she did look back to her lane of travel, Mr. Eastman's car was just one length in front of her and came to a sudden stop, and she did not have time to stop and avoid hitting him. In her words, "I just slammed and hoped for the best that I would stop in time." The weather was clear at the time of the accident, and it was still daylight outside. There were no external factors that impeded her vision or ability to maintain control of her vehicle.

While Ms. Peterson testified that Mr. Eastman's vehicle coming to a "sudden stop" created a hazard for her, the sudden emergency doctrine does not apply. As the

7

law above states, "[t]he sudden emergency doctrine cannot be used by one who fails to use due care in avoiding the emergency." *Leblanc*, 159 So.3d at 1146-47. Ms. Peterson admitted she took her eyes off the vehicle in front of her despite the heavy traffic. Furthermore, she testified that the traffic in front of her was "bottling up," which means that Mr. Eastman's vehicle coming to a stop was expected. There was no evidence set forth at trial showing that Ms. Peterson kept a safe distance between her vehicle and Mr. Eastman's, nor that she closely observed his vehicle in front of her. Regardless of whether Mr. Eastman created a hazard for Ms. Peterson, Ms. Peterson failed to exercise due care, and therefore she failed to rebut the presumption of negligence.

Although Ms. Peterson is presumed to be negligent, we must still consider comparative fault. In its written reasons, the trial court appears to suggest that comparative fault does not apply, stating: "The court finds Eastman free from fault in this accident and Peterson 100% at fault since she failed to prove the necessary facts to rebut applicable presumptions." This is an incorrect interpretation of the law. Notwithstanding the presumption of negligence in rear-end collisions, the ordinary rules of comparative negligence apply, and thus a leading motorist may still be assessed with comparative fault. *Leblanc*, 159 So.3d at 1147; *see also Graffia v. La. Farm Bureau Cas. Ins. Co.*, 08-1480 (La.App. 1 Cir. 2/13/09), 6 So.3d 270. In other words, although Ms. Peterson failed to rebut the presumption of negligence, such does not mean that she is automatically assessed with one hundred percent fault.

Defendants argue that the jury was reasonable in allocating equal fault to Mr. Eastman and Ms. Peterson, given the conflicting testimony at trial regarding whether Mr. Eastman first struck Mr. Burns prior to being rear-ended by Ms. Peterson. On the other hand, Mr. Eastman contends that the conflicting testimony is irrelevant for

8

purposes of assigning liability. He suggests that Ms. Peterson would have rear-ended Mr. Eastman in either scenario. If Mr. Eastman had stopped sooner, there would have been even less space for Ms. Peterson to stop, and therefore she would have struck Mr. Eastman's vehicle sooner and with more force. Relying on the *Mandible* case, Mr. Eastman argues that any alleged negligence on his own part was not the proximate cause of Ms. Peterson's rear-ending him.

In light of the evidence before us, we find that reasonable minds could not have found that Mr. Eastman was fifty percent at fault for the crash. Regardless of whether Mr. Eastman independently struck Mr. Burns prior to being rear-ended by Ms. Peterson, Ms. Peterson would have still struck Mr. Eastman, as she failed to keep a safe distance between her vehicle and his and was looking away in the moments before the crash. Although the trial court incorrectly misstates the law in its written reasons, it correctly granted the JNOV on liability.

Having found that the JNOV on liability was warranted, the trial court became the trier of fact. Its subsequent determination of liability is reviewed under the manifest error standard. As discussed above, there was ample evidence in the record to support Ms. Peterson's fault. We cannot say that the trial court's assigning of one hundred percent fault to Ms. Peterson was clearly wrong. We affirm the trial judge's judgment on the issue of liability.

**Past and Future Medical Expenses**

In their second assignment, defendants claim that the trial court's granting of JNOV on damages for past and future medical is error. The basis of defendants' argument is a single notation in a chiropractor's record.

Prior to the crash at issue, Mr. Eastman treated with a chiropractor, Dr. Shaine Rider, for neck and back pain, dating from May 29, 2014 to August 14, 2014. There

is no dispute that Mr. Eastman has a pre-existing degenerative condition, known as diffuse idiopathic skeletal hyperostosis or "DISH," that causes neck pain. He stopped treating for DISH on August 14, 2014, more than a year prior to the crash at issue.

After the crash, Mr. Eastman again began treating with Dr. Rider. He temporarily took a break from treatment with Dr. Rider after a visit on July 27, 2016, in which Dr. Rider's chiropractic records indicate he reached "MMI" (maximum medical improvement). A few weeks later, on September 13, 2016, Mr. Eastman returned to Dr. Rider for more treatment. Dr. Rider's records from September 13, 2016, onward list the onset of Mr. Eastman's condition as beginning in 2009. Relying solely on Dr. Rider's records, defendants argue that any medical treatment after July 27, 2016, in which Mr. Eastman allegedly reached MMI, must be related to the degenerative, pre-existing DISH condition, rather than Mr. Eastman's car crash injuries.

The jury was apparently persuaded by defense counsel's argument and awarded Mr. Eastman $19,732.14 in past medical expenses, which is the sum of Mr. Eastman's medical expenses from the date of the accident up until July 27, 2016. In granting the JNOV, the trial judge increased Mr. Eastman's past medical award to $138,419.06, which is the sum of Mr. Eastman's medical expenses from the date of the accident up until the date of trial, which commenced on June 28, 2021.

The evidence clearly establishes that no reasonable person would limit Mr. Eastman's past medical expenses to $19,732.14. First, Mr. Eastman returned to Dr. Rider just a month and a half later on September 13, 2016, clearly indicating he was not at MMI. Furthermore, Dr. Rider did not testify at trial, and therefore, he never opined that Mr. Eastman's subsequent, extensive medical treatment was related

10

purely to his DISH condition. No medical provider testified as such, either. Beyond that, Dr. Rider is a chiropractor, not a medical doctor, and it was unreasonable for the jury to have relied on a notation stating "MMI" in light of the overwhelming evidence presented by medical doctors.

What the overwhelming evidence does show is that Mr. Eastman sought extensive medical treatment for his crash injuries, continuing far beyond the July 27, 2016 date when the chiropractor records reference MMI. Mr. Eastman initially sought conservative treatment with Dr. Rider, but when he did not get full relief, he went to specialists in both Houston and Lake Charles. He treated with Dr. Cotler in Houston in 2016 and 2017. He also treated with Dr. Morton, who performed several cervical injections, trigger point and facet injections. Dr. Morton referred Mr. Eastman to Dr. Kelly, a neurosurgeon, who found that Mr. Eastman had significant symptoms that interfered with his daily life. Dr. Kelly referred Mr. Eastman to a complex spinal surgeon specialist in Houston, Dr. Marco. Unfortunately, Mr. Eastman was ultimately not a surgical candidate, leaving his only option as long-term pain management. Dr. Kelly therefore referred Mr. Eastman to Dr. Crookshank for pain management, who performed medial branch block procedures on Mr. Eastman's cervical spine. These were in preparation for radio frequency ablation ("RFA") procedures, which were performed on Mr. Eastman on February 20, 2020, and again on June 8, 2021. The RFAs were successful and helped to reduce Mr. Eastman's pain.

Both Dr. Kelly and Dr. Crookshank testified that Mr. Eastman's medical treatment after the crash was caused by and related to the crash. They further found that the crash likely aggravated Mr. Eastman's pre-existing DISH condition. Dr. Crookshank also specifically testified that the pain he was treating Mr. Eastman for

"was at levels that do not have drastic radiologic findings consistent with DISH at those levels." He indicated that Mr. Eastman responded to treatment at those specific levels. Thus, the evidence presented at trial showed that Mr. Eastman's treatment post-crash was related to his crash injuries rather than the DISH condition.

Tellingly, even defendants' own medical expert, Dr. Esses, testified that Mr. Eastman's post-crash treatment was related, at least in part, to the crash:

> Q. And at least when [Mr. Eastman] saw you in June of 2020, you reported that he had pain and had seen doctors, and that you thought that was appropriate and that he should have sought treatment; is that correct?
>
> A. Yes, sir.
>
> Q. So at least for 4 ½ years, you agree that it was appropriate for him to seek treatment for the pain in his neck?
>
> A. I did.
>
> Q. And you felt like the pain in his neck was related to the automobile accident?
>
> A. In part, yes, sir.

Thus, defendants' argument that DISH is the sole cause of Mr. Eastman's pain after July 2016 is unconvincing. It is, simply, argument—not evidence. The evidence—even defendants' own expert—shows that Mr. Eastman's medical treatment at issue was causally related at least in part to the November 19, 2015 crash. Therefore, the trial court correctly granted the JNOV on this issue. We also find that the trial court was not manifestly erroneous in awarding $138,419.06 in past medical expenses to Mr. Eastman. As discussed at length above, the medical evidence at trial overwhelmingly supported such an award.

As to the future medical expenses, defendants re-urge their position that Mr. Eastman reached MMI with Dr. Rider on July 27, 2016. Because no future medical is necessary, they reason that no future medical treatment should be awarded.

Conversely, plaintiffs set forth robust evidence regarding the necessity for Mr. Eastman's future medical treatment, namely through RFAs. The total future medical cost presented by plaintiffs at trial was $625,875.00, which is the amount awarded in the granting of the JNOV. At trial, plaintiffs' medical expert, Dr. Crookshank, testified in detail regarding the purpose of RFAs, the mechanism of RFAs, the efficacy of RFAs, and the recommendation specific to Mr. Eastman regarding RFAs. He testified that a yearly RFA for the remainder of Mr. Eastman's life is the most reasonable course of treatment, barring any extenuating circumstances. Dr. Crookshank testified that he would have no issue giving Mr. Eastman a yearly RFA for the rest of his life.

We find that the unrefuted evidence supports the granting of the JNOV. As discussed above, we are not persuaded by defendants' argument regarding a single notation in a chiropractor's record. We also find it notable that defendants' medical expert, Dr. Esses, testified that he did not disagree with Dr. Crookshank. Because of this, no reasonable persons could have found that Mr. Eastman was not entitled to any future medical award.

We also find that the trial court was not manifestly erroneous in awarding $625,875.00 to Mr. Eastman. Simply put, no evidence was put forth to dispute Mr. Eastman's future medical expenses. As discussed above, the trial judge hears the testimony firsthand and is better equipped to evaluate damages than is the appellate court. *Anderson*, 583 So.2d at 834. We find that the trial court's awarding of future medical is reasonable given the evidence.

**General Damages**

Defendants' third assignment of error is that the trial court erred by granting the JNOV on the issue of future loss of enjoyment of life, future pain and suffering and future mental anguish. In the granting of the JNOV, the trial judge noted "that the awards for past and present loss of enjoyment of life, past and present pain and suffering, and past and present mental anguish are inordinately miniscule when compared to or aligned with the adjusted medical evidence." Despite this, the trial court did not alter the jury's award of past and present damages of $71,000.00. However, the court did increase the future loss of enjoyment of life, future pain and suffering and future mental anguish awards from zero dollars awarded by the jury to $150,000.00.

Defendants dispute this award, noting that surveillance videos show Mr. Eastman engaging in "normal" activities and lifestyle. The jury saw photographs showing Mr. Eastman catching ten-to-twelve-pound bass after the crash. They also saw video surveillance of Mr. Eastman hitting fly and ground balls to the Barbe High School Girls' Softball team, of which he was an assistant coach. Because of this, defendants posit that it was reasonable for a jury to award zero dollars. However, we do not find that the video surveillance and photographs stand for the proposition set forth by defendants, i.e., that Mr. Eastman is not in pain. Merely participating in one's daily activities does not mean that he is doing so pain-free.

The jury's zero dollar award ignores the overwhelming evidence demonstrating the depth of Mr. Eastman's pain, suffering, and loss of enjoyment of life. Not only did Mr. Eastman testify regarding how the crash has affected his daily life, but his wife and son also offered impactful testimony describing the pain and limitations Mr. Eastman has experienced since the accident.

14

Furthermore, the objective evidence presented by Mr. Eastman's treating physicians prove that Mr. Eastman suffered physical pain and limitations caused by the crash. Considering the amount of future medical treatment that is required, a zero dollar award for future general damages is unreasonable.

After thoroughly reviewing the record, we find that the facts and inferences point so strongly and overwhelmingly in favor of Mr. Eastman that reasonable persons could not conclude that he is not entitled to any future general damages. Therefore, we affirm the trial court's JNOV on this issue.

As to the judge's award of $150,000.00 to Mr. Eastman for future general damages, we find that such is not manifestly erroneous given the evidence put forth by Mr. Eastman concerning his pain and need for future medical treatment.

**Future Earning Capacity**

In defendants' final assignment of error, they allege that the trial court committed error by granting the JNOV on the issue of loss of future earning capacity. The jury awarded Mr. Eastman nothing for this category of damages, while the trial court granted the JNOV on this issue and awarded him $130,000.00.

Defendants posit that it was reasonable for the jury to conclude that Mr. Eastman would continue to work given his testimony that he had not missed any significant work in the five years since the crash and planned to work until he retired at seventy. However, defendants' position is speculation, not evidence. The evidence at trial unequivocally established that Mr. Eastman would lose approximately 2.7 years of work due to the accident, equating to $268,796.00. This evidence was supported by the unrefuted testimony of Dr. Bettinger, Mr. Eastman's economist, and Glen Hebert, Mr. Eastman's vocational expert.

For whatever reason, defendants failed to put forth their own economic expert. While Defendants elicited testimony from a vocational expert, Mr. Robert Gisclair, he did not perform a vocational rehabilitation assessment or evaluation of Mr. Eastman. Instead, Mr. Gisclair's testimony was limited to rebutting plaintiff's vocational expert:

Q. Mr. Gislcair, you didn't perform any life-care planning in this case, did you?

A. No sir, I was only asked to do a critique.

Q. So, the only testimony you're going to give the jury today is a critique of what Mr. Hebert did; is that correct?

A. That's exactly right.

Therefore, we find that the evidence points so strongly and overwhelmingly in favor of Mr. Eastman that reasonable persons could not have concluded that he is not entitled to any loss of future earning capacity. The trial court correctly granted the JNOV on this issue.

In the granting of the JNOV on this issue, the trial judge awarded $130,000.00 to Mr. Eastman, which is less than the amount set forth by plaintiffs at trial. In choosing to award $130,000.00 instead of the $268,796.00 presented by plaintiffs, the trial court explained that some of Mr. Eastman's diminished work capacity may be due to his pre-existing DISH condition. We find this choice was reasonable and within the trial court's wide discretion as "trier of fact," and therefore not manifestly erroneous.

## CONCLUSION

For the reasons stated above, we affirm the trial court's granting of the judgment notwithstanding the verdict and subsequent altering of the jury's verdict both in liability and damages.

AFFIRMED.